[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The petitioner claims that he was denied the effective assistance of counsel because his trial attorney, Jerry Gruenbaum, failed to investigate, discover and present evidence relating to his mental state and because Gruenbaum misrepresented the result of the petitioner's guilty plea and the "range of outcomes possible in the event petitioner did not plead guilty." Finally, the petitioner asserts that he was denied the effective assistance of counsel at the sentencing hearing because "Gruenbaum failed to present any evidence pertaining to [Copas's] mental state to the court."
The underlying facts are not in dispute. On April 27, 1986 the body of Laura Bieu, age 16, was found off Hop River Road, an isolated area of Coventry. The body was partially covered by rocks. The victim had been stabbed several times and her head crushed by a rock.
The police conducted a "spot check" surveillance of the area in which the victim was discovered. An older model, four door brown car was stopped. The driver identified himself as David Copas. He stated that he was attempting to use the road as a "shortcut" to Hartford. Hop River Road could not reasonably be considered a short cut. The authorities also noted that the petitioner appeared "nervous". A witness told the troopers that as the petitioner left the area, he looked directly at the stone wall near where the body was found.
Investigation revealed that on April 25, 1986, the petitioner had given a ride to three girls, including the victim. He met them at the Lucky Strike bowling alley in Mansfield. One of the girls accurately described the Copas vehicle. The two surviving girls stated that they had been dropped off by the petitioner at 11:30 P.M. at one of their CT Page 2385 homes in Ashford and that the victim left with the petitioner at about midnight to be dropped off at her grandparents' house.
Police officers were told by another witness that while she and three friends were riding recreational vehicles down Hop River Road at approximately 2:20 a.m. on April 26, 1986 she observed a vehicle similar to the petitioner's in the middle of the road. A man whose appearance was consistent with Copas's was standing in front of the car. She and her friends continued riding and when she returned to Hop River Road forty-five minutes later, the man was still in the area. Officers brought the witness to Hop River Road and she pointed to the spot where she observed the car. This site was where the victims body was discovered.
Based upon the foregoing information search warrants were obtained for the petitioner's person, car, and home. Officers arrived with the warrants at the Copas residence about 10:00 p.m. on April 29th. No one was home, but a note on the door indicated that the petitioner could be found at the Lucky Strike Bowling Alley. Police paged Copas causing two of his friends to present themselves. One man was the brother of the petitioner's wife. The two men gave a note to the officers signed by a Phillip "Frenchy" Tardif, another friend of the petitioner. This note indicated that Tardif had picked up the petitioner in the early morning of April 26, 1986 on Route 6 and assisted him with car trouble near where Bieu's body was found. The men then informed the police that the petitioner was at Windham Hospital where Copas had taken his wife's infant son.
Officers located the petitioner, conducted a brief search of his person, seized his leather jacket and a knife and then read a rights form to him. They transported him to the Coventry Police Department.
Copas was permitted to use a telephone to contact an attorney. He indicated that he wished to speak to his wife before contacting an attorney. A short while later Cathy Copas, his wife, arrived. Mrs. Copas asked to speak with the petitioner alone and she and the petitioner were left alone in the office of Human Services at the Coventry Town Hall. The officers could observe both people through a glass door, however, the petitioner embraced his wife, spoke to her and she cried out "Oh, why!"
About an hour later, the petitioner told Detective Malchik that he would like to talk to him but wanted his wife present. Copas's statement was made in the presence of Cathy CT Page 2386 Copas and Detective Pelkey. Detective Malchik read the petitioner his rights for the second time. The petitioner signed the waiver form. He told the police repeatedly that he no longer wished to contact a lawyer.
Copas gave a verbal statement which was recorded on tape. Detective Malchik also prepared a written statement for the petitioner's signature. It set forth in some detail, Copas's version of the events that occurred the night of April 25th and the early morning hours of the 26th. Several of the details were corroborated by police investigation. Among the details recited in the confession was the petitioner's claim that he and the victim abused marijuana that night. Copas was arrested on May 1, 1986 and charged with murder in violation of Section 53a-54a of the Connecticut General Statutes.[1] On or about May 2, 1986, Attorney Jerry Gruenbaum became involved in the defense of the petitioner.[2]
On June 11, 1986, Attorney Gruenbaum filed a "Motion for Discovery" and "Notice" of the defendant's intent to introduce expert testimony relating to the existence of a mental disease or defect. On June 12, he filed a "Motion To Suppress" the defendant's confession claiming same was not voluntarily made nor made with the assistance of counsel. The Motion was never argued. Because the prosecution had an "open-file" policy allowing defense counsel access to the state's file, Gruenbaum did not pursue the Motion for Discovery. According to trial counsel, he never requested an independent psychiatric examination because he did not feel that any psychiatrically oriented defenses applied. Mr. Gruenbaum testified that he examined Copas's school records. He also claimed to have talked by telephone to a psychiatrist with whom the petitioner had contact while he was incarcerated at the Brooklyn Correctional facility.
The evidence adduced at the habeas corpus hearing indicated that during his childhood the petitioner had an attention deficit disorder impacting negatively on his school performance and for which he had been prescribed Ritalin. Apparently the petitioner's self esteem was so adversely affected that he failed both academically and socially. Dr. Kenneth Selig, a specialist in adult and forensic psychiatry, testified that the petitioner, from his childhood on, periodically had difficulty controlling his impulses. The problem, according to Dr. Selig, was aggravated when Copas consumed drugs and/or alcohol. It was further aggravated by stress. Dr. Selig diagnosed Copas as having exhibited alcohol abuse, marijuana abuse, an atypical impulse disorder and a mixed personality disorder with paranoid narcissistic and CT Page 2387 anti-social features. His opinion was that the petitioner suffered from these disorders in April, 1986 and that said ailments "acted to diminish his capacity to control his behavior".
Although he had filed a notice to the state respecting a defense based upon mental disease or defect, Attorney Gruenbaum was unable to define "extreme emotional disturbance". He was unable to set forth the elements of the crime of murder.
It became apparent that trial counsel, at best, was confused about presenting an affirmative defense based upon mental disease or defect. In considering the feasibility of presenting such a defense, Gruenbaum relied upon the school records that had been brought to him by the petitioner's mother, his interviews with the petitioner, one telephone conversation with a psychiatrist at the Brooklyn Correctional Center and one with the director of a drug treatment facility where Copas had spent several months. In reviewing the transcript of a grievance committee hearing held on March 16, 1988, which was made an exhibit in the habeas corpus proceeding, Gruenbaum made several telling comments. With regard to a clinical evaluation of the petitioner that was ordered by the court for sentencing purposes, Mr. Gruenbaum stated, "[t]hat was definitely not a very helpful document.[3]
It was the most damaging document that was in David's file, but it also talked about his past criminal record, and so forth, which I knew about. . . It was an extremely biased document against him." Another troublesome remark by Gruenbaum during the grievance committee hearing was, "[w]hat we did of course was to schedule for a psychological evaluation for David, and that was nothing as far as Whiting or anything of that nonsense, and Caldwell [the state's attorney] never made any promise of Whiting either." A third telling comment trial counsel made occurred when Gruenbaum testified with respect to Copas's past psychological history gleaned from his school records: "[u]nfortunately, nothing in there was convincing from my point of view as an insanity defense."
Gruenbaum filed his appearance for the petitioner on May 5, 1986. Copas pleaded guilty on October 7, 1986. There was no plea bargain. Upon his plea of guilty to murder, the state would argue for the maximum sentence. The defense was free to argue for any lesser sentence.
The right to counsel in criminal proceedings is guaranteed both by the Sixth and Fourteenth Amendments to the CT Page 2388 United States Constitution and Article I, Section 8 of the Connecticut Constitution. The courts have long recognized that the right to counsel applies to all critical stages of criminal proceedings. Gardner v. Florida, 430 U.S. 349, 358
(1977); United States v. Daniels, 558 F.2d 122, 125, 127-128
(2d Cir. 1977); United States v. Pinkney, 551 F.2d 1241
(D.C. Cir. 1976); United States v. Robin, 545 F.2d 775 (2d Cir. 1976); United States v. Lucas, 513 F.2d 509, 511 n. 4 (D.C. Cir. 1975); United States v. Johnson, 475 F.2d 1297,1299-1300 (D.C. Cir. 1973). Certainly, the sentencing hearing is a critical stage. See Gardner v. Florida at 358.
Sections 923 through 927 of our Practice Act deal with the role of defense counsel at the sentencing hearing. These sections require the defendant's advocate to "familiarize himself with the contents of the presentence report, including the evaluative summary, and any special or psychiatric reports pertaining to his client".[4] The rules also permit the attorney to submit appropriate supplemental documents. Section 919 of the Practice Book provides:
 Before imposing a sentence or making any other disposition after the acceptance of a plea of guilty or nolo contendere or upon a verdict or finding of guilty, the judicial authority shall, upon the date previously determined for sentencing, conduct a sentencing hearing as follows:
 (1) The judicial authority shall afford the parties an opportunity to be heard and, in his discretion, to present evidence on any matter relevant to the disposition, and to explain or controvert the presentence investigation report or any other document relied upon by the judicial authority in imposing sentence.
 (3) The judicial authority shall allow the defendant a reasonable opportunity to make a personal statement in his own behalf an to present any information in mitigation of the sentence.
As a crucial stage of the criminal process, the sentencing hearing entitles a defendant to the effective assistance of counsel. Gardner v. Florida, Id. See also State v. De Jesus, 10 Conn. App. 591, 596-597 (1987). Trial counsel's conduct in preparing for and in his presentation of the sentencing hearing was not reasonably competent nor was it within the range of competence of Connecticut attorneys practicing criminal law in 1986. Mr. Gruenbaum's testimony at the habeas corpus trial indicated that he did not know or CT Page 2389 appreciate the differences between "insanity", "extreme emotional disturbance" and "diminished capacity". He was unable to distinguish between the clinical evaluation and the pre-sentence report.
Section 18-6.3 of the American Bar Association's Sentencing Alternatives and Procedures states the following:
 (e) The defense attorney should recognize that the sentencing stage is the time at which for many defendants the most important service of the entire proceeding can be performed.
 (f) The duties of the defense attorney with respect to each specific sentence should include the following steps: . . .
 (ii) The attorney should satisfy himself or herself that the factual basis for the sentence will be adequate both for the purposes of the sentencing court and, to the extent ascertainable, for the purposes of subsequent dispositional authorities. The attorney should take particular care to make certain that the record of the sentencing proceedings will accurately reflect all relevant mitigating circumstances relating either to the offense or to the characteristics of the defendant which were not disclosed during the guilt phase of the case and to ensure that such record will be adequately preserved:
 (A) If the attorney has access to the presentence report, this duty should at a minimum involve verification of the essential bases of the report and amplification at the sentence proceeding of parts which seem to be inadequate. The attorney should also take proper steps to controvert any inaccuracies in the report which are adverse to the client's interests. The first such step should normally involve an attempt to avoid the formal production of evidence in open court by reaching an informal agreement as provided in standard 18-5.5(b)j. . ."
The commentaries to 13-6.3 further refine counsel's duty, as follows:
Defense Attorney: Specific Duties; Verification
Case law has imposed a duty on defense counsel CT Page 2390 to "[f]amiliarize himself with all reports serving as a foundation for sentence sufficiently in advance of the sentence hearing" in order to be in a position "to verify the information contained therein." Counsel should then seek "to supplement the reports when incomplete and challenge them when inaccurate." United States v. Pinkney, held it "axiomatic that this duty extends to familiarization with all reports upon which disposition may be based," including psychiatric and clinical reports and the evaluative summary of the presentence report where these are disclosable to the defense attorney.
The standard, having recognized that sentencing may well be the most important step in the defense of a criminal matter, goes on to state that "where necessary, counsel should insist on a continuance that will provide adequate time for verifying allegations in the presentence report. Both case law and model standards recognize that the effective assistance of counsel at sentencing is impossible without a sufficient opportunity for preparation." The commentary cites the following language taken from United States v. Pinkney, 551 F.2d 1241, 1251 (D.C. Cir. 1976):
 Counsel's functions and responsibilities at sentencing are not easily defined — it has been said that nowhere in the criminal justice process is there more confusion as to what specific role counsel has or is qualified to play than in sentencing.' It is at least clear, however, that counsel should be prepared to present to the court all the factors and circumstances necessary to ensure a reasonably meaningful hearing on sentence.
Had Mr. Gruenbaum read Donald Rilla's clinical evaluation with care, he would have discovered many significant mitigating matters to bring to the attention of the sentencing judge. Among the facts worthy of mention would have been the evidence of the petitioner's having been born into a dysfunctional family, his physical problems, his head injuries, the death of his grandfather when petitioner was 15 years,[5] his substance abuse problems and the fact that he had undergone mental health treatment of varying types from the age of eight years. Because the P.S.I. dismissed Rilla's report by stating, "[T]he internal workings of the Frazier [parents'] home would appear to have been stable and supportive to David, but the report of the Court's Diagnostic Clinic attached hereto sketches some of the underlying tensions at least as David saw them", it was especially important and necessary that Gruenbaum highlight the CT Page 2391 mitigating factors. It would have been even better had counsel buttressed their impact with other evidence.
The sentencing occurred on November 19, 1986 before the Hon. Eugene T. Kelly. Between his change of plea on October 7th and the sentencing hearing, Copas sought to withdraw his plea without success. At the petitioner's urging, Gruenbaum filed a Motion to Withdraw, as counsel, which was denied. At sentencing two of the victim's relatives addressed the Court and the state's attorney, Donald Caldwell summed up and requested the maximum sentence be imposed.
Attorney Gruenbaum next addressed the court. He did not present anyone else to speak on his client's behalf. Gruenbaum's remarks are significant because they underscore the inadequacy of counsel's representation at the sentence hearing.
 Mr. Gruenbaum: "I am sorry. Your honor, until two weeks ago Mr. Kopas [sic] has been very cooperative with this court. We have had his confession and his guilty plea here in the court and he did that basically with the intention of saving Laura's family and his own family as well from the ordeal of a lengthy trial. We really do sympathize with the family. He is quite remorseful about this act.
 "However, I realize what has been happening the last two weeks here needs some explanation for that.
 "Mr. Kopas [sic] has no one, really, except his wife. His wife is pregnant. She is expecting a child within the next twenty-four hours. I have called on the phone. She is in labor. That is the reason why she is not here. [According to her testimony at the habeas corpus trial, Mrs. Copas was pregnant but not in labor. The reason she was not in court, she claimed, was that she was not informed].
 "Mr. Kopas [sic] really has no way of communicating with the outside through me and through his wife. His wife told basically that there is an investigator outside she's hired, and another attorney, and his name I don't have but I think it's of no significance at this point, but she did tell him those things and because of this, of that, and the information he was told as far as CT Page 2392 what Sheriff Risley received, he felt somehow that maybe the rest of the information should come out in the trial. That was his reason for requesting it.
 "Now, he did make a confession. I believe the confession was quite detailed, which was taken in its entirety in that confession and he made a — he made it clear that he did stab her. But he did so after she attacked him first. And as a result of — well, for whatever reason he lost control and he took a life.
 "As Mr. Caldwell stated, there is nothing in the evidence anywhere that states that this was planned in any way. It was sudden action on his part.
 "He doesn't truly have a violent past. While it's true that he has a criminal record, it's been basically for auto theft and the like. Nothing really shows that there was any reason to fear his presence. It was not of this individual. And I do believe since he is here that he can be rehabilitated. But, on the other hand, I also know he needs help. And we all realize he has been incarcerated for it. But he needs some kind of a chance. I, therefore, request with his permission again, that he be incarcerated for a length of time, I realize, that is in accordance with this crime but that proper sentencing is not life but rather forty years. Thank you."
THE COURT: "Thank you, Mr. Gruenbaum.
 "Mr. Kopas, [sic] did you want to say anything or did you want to rely on what your lawyer said?"
Mr. Kopas [sic]: "He said it fine, sir."
 THE COURT: "Thank you, Mr. Kopas. [sic] Would you like to stand, please, Mr. Kopas. [sic] Thank you."
When the judge sentenced the petitioner to the custody of the Commissioner of Corrections for fifty (50) years, he made reference to the comments of Mr. Caldwell, the victim's relatives, Mr. Gruenbaum, the statute, the probable cause hearing and the P.S.I. The court made no reference to Rilla's report. CT Page 2393
The United States Supreme Court "has concluded that the assistance of counsel is among those `constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.'" Hollaway v. Arkansas, 435 U.S. 475,489, 98 S.Ct. 1173 (1978). In deciding whether counsel's performance has been such as to violate petitioner's constitutional right to effective assistance of counsel, this court must apply the two-prong test articulated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, reh. denied 467 U.S. 1267 (1984).
 The standard used to review claims of ineffective assistance of counsel is whether defense counsel's performance was "reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law."
 And "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."
Miller v. Angliker, 4 Conn. App. 406, 419, cert. denied197 Conn. 809 (1985), citing Strickland, supra at 694, and other cases; see also Chace v. Bronson, 19 Conn. App. 674, 677-678
(1989); Levine v. Manson, 195 Conn. 636, 640 (1985). Both determinations are mixed questions of law and fact. Strickland, supra at 698. See also Myers v. Manson, 192 Conn. 383, 393
(1984).
Apart from certain general and basic duties (of loyalty, to avoid conflicts of interest, to advocate the defendant's cause, to consult with and keep the defendant informed, to use skill and knowledge to insure a reliable adversarial testing process), "no particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel." Strickland, supra at 688-689. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690.
As reprehensible and vicious was the petitioner's criminal conduct and as overwhelming the evidence of his guilt appears to be, the law dictates, nonetheless, that he is entitled to the habeas corpus relief that he seeks. CT Page 2394
Based upon all of the evidence presented at the habeas corpus trial, it is the conclusion of the court that there is a reasonable probability that, but for Gruenbaum's incompetent representation of the petitioner the result of the proceeding would have been different. Having come to that conclusion, the court will not address the other claims of ineffective assistance of counsel.
The conviction of the petitioner is hereby vacated and the case is ordered returned to the trial court.
BY THE COURT HON. HOWARD SCHEINBLUM SUPERIOR COURT JUDGE
[EDITORS' NOTE: APPENDIX 1 IS ELECTRONICALLY NON-TRANSFERRABLE.]