SEYMOUR LEVINE *v.* JOHN R. MANSON,
COMMISSIONER OF CORRECTION
(11590)

PETERS, C. J., HEALEY, PARSKEY, SHEA and SANTANIELLO, Js.

Argued February 5—decision released April 9, 1985

*Dominick J. Thomas, Jr.,* with whom, on the brief, was *Sheila M. Press,* for the appellant (petitioner).

*Richard D. Arconti,* special prosecuting attorney, for the appellee (respondent).

ARTHUR H. HEALEY, J. The petitioner, Seymour Levine, was found guilty after a jury trial of one count of assault in the second degree in violation of General Statutes § 53a-60 (a) (2) and three counts of threatening in violation of General Statutes § 53a-62. Thereafter, he petitioned for a writ of habeas corpus claiming that he had not received the effective assistance of counsel guaranteed by the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution.[1] After a full evidentiary hearing,[2] the court denied his petition. We find no error.

Some of the facts that the jury could reasonably have found from the conflicting versions of the events that resulted in the petitioner's arrest were the following: The incident that produced the arrest of the petitioner took place on July 24, 1981, on Lyrical Lane in Newtown where the petitioner and the victim, Alfred Duchaine, were neighbors.[3] As Duchaine drove up to

---

[1] We note that this petitioner's appeal from his criminal convictions has been resolved against him. See *State* v. *Levine,* 39 Conn. Sup. 494, 466 A.2d 814 (1983). Upon inquiry at oral argument, the petitioner's counsel informed us that this habeas corpus proceeding was instituted because he was confined to jail unable to post bond. A fair reading of the memorandum of decision of the habeas court demonstrates that it found no deliberate bypass. See *McClain* v. *Manson,* 183 Conn. 418, 439 A.2d 430 (1981).

[2] At the evidentiary hearing, the witnesses testifying were trial defense counsel, the petitioner, his daughter Susan and an attorney offered by the petitioner as an expert witness. The inquiry there went solely to the issue of the alleged ineffective assistance of counsel.

[3] We have examined the transcript of the jury trial and the two transcripts of the habeas corpus proceedings, one of June 17, 1982, and one of June 22, 1982.

his driveway, he saw Susan Levine, the petitioner's daughter, walking an afghan dog owned by the Levines in front of his (Duchaine's) house. The dog stopped and defecated in front of Duchaine's house. Duchaine obtained a short-handled shovel, scooped up the excrement and deposited it on the petitioner's lawn. At that time, the petitioner was watering his flowers and the lawn with a garden hose that had a detachable metal nozzle. The petitioner, who observed Duchaine do this, became involved in a heated argument with Duchaine in the course of which he struck Duchaine in the back of his head with the metal nozzle. This caused the victim to stagger and resulted in a lump on his head.

Two brothers, Robert Mandulak and Michael Mandulak, who were working on Robert's neighboring property, came to the scene upon hearing Duchaine call Robert's name. With Duchaine there and the two Mandulaks approaching him, the petitioner removed a pistol from his pants pocket and stuck it in Duchaine's face. He also said to the approaching Mandulaks: "I have enough here for all of you." Duchaine then walked back to his house with the Mandulaks and he called the police who, after an investigation, arrested the petitioner.

The petitioner's claims of ineffective assistance of counsel directed against his privately retained trial defense counsel are multiple and do not singly, in clusters or cumulatively persuade us of the merits of his claim. These claims include inadequate pretrial investigation; "numerous failures to object to highly prejudicial testimony"; "failure to cross-examine properly," the cross-examination being variously characterized as "disorganized," "deficient," "abortive" or "abbreviated"; failure to explore matters important to the defense; failure to call as a witness someone identified in the testimony as present during the commission of the crimes charged; examining the petitioner

so as to prejudice him in the eyes of the jury; failure to prepare properly by obtaining documentary evidence that was a public record; failure to take exception to the trial judge's rulings; failure to request appropriate jury instructions at the trial; and indulging in contradictory and disjointed trial strategy.

It is helpful to set out here several postulates that are meaningful to the petitioner's claim. The right to effective assistance of counsel is guaranteed by the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. This right is equally applicable whether defense counsel is court-appointed or, as in the present case, privately-retained. *McMann* v. *Richardson,* 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970); *State* v. *Mason,* 186 Conn. 574, 577, 442 A.2d 1335 (1982); *State* v. *Barber,* 173 Conn. 153, 155, 376 A.2d 1108 (1977).

Our cases demonstrate that "[t]o succeed in his claim of ineffective assistance of counsel, the petitioner must show that his attorney's performance was not ' "reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law" '; *State* v. *Clark,* 170 Conn. 273, 283, 365 A.2d 1167, cert. denied, 425 U.S. 962, 96 S. Ct. 1748, 48 L. Ed. 2d 208 (1976), quoting *Gentry* v. *Warden,* 167 Conn. 639, 646, 356 A.2d 902 (1975); and further, that this ' "lack of competency contributed to the conviction." ' *State* v. *Clark,* supra; see also *State* v. *Gregory,* 191 Conn. 142, 143–44, 463 A.2d 609 (1983); *State* v. *Scielzo,* 190 Conn. 191, 206, 460 A.2d 951 (1983); *State* v. *Chairamonte,* 189 Conn. 61, 63, 454 A.2d 272 (1983)." *Williams* v. *Manson,* 195 Conn. 561, 564, 489 A.2d 377 (1985).

We now have additional guidance on the petitioner's constitutional claim from the United States Supreme

Court's decision in *Strickland* v. *Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh. denied, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984). "In *Strickland* the Court, while holding that the Sixth Amendment right to counsel is one of 'effective assistance' . . . nevertheless imposed a two-component showing before a claim of deprivation of that right may be made: first, it must be shown that the attorney's performance was so deficient and his errors so serious that 'counsel was not functioning as . . . "counsel" ' . . . and, second, that those errors functioned so 'as to deprive the defendant of a fair trial, a trial whose result is reliable' . . . i.e., that there exists 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Gulliver* v. *Dalsheim,* 739 F.2d 104, 107 (2d Cir. 1984), quoting *Strickland* v. *Washington,* supra, 687, 694. *Strickland* stated not only that "[j]udicial scrutiny of counsel's performance must be highly deferential" but also that the reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under these circumstances, the challenged action 'might be considered sound trial strategy.' [*Strickland* v. *Washington,* supra, 689]." *United States ex rel. Roche* v. *Scully,* 739 F.2d 739, 742 (2d Cir. 1984). In fairly assessing the attorney's conduct it is required "that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland* v. *Washington,* supra. The petitioner has the burden to demonstrate that counsel's conduct fell below the required standard and that that lack of competency contributed to his conviction. *State* v. *Mason,* supra, 578; *State* v. *Clark,* supra, 283; *In re King,* 133 Vt. 245, 248, 336 A.2d 195 (1975).

The judge in this habeas corpus proceeding could have reasonably believed from the evidence before him, much of it conflicting, the following:

The petitioner's trial defense attorney had been a practicing attorney for about twenty-four years and estimated that he had tried thirty criminal cases to a jury. Prior to trial, the trial defense attorney, who had represented the petitioner in the past and had known him for maybe as "much as twenty [years]," had spoken to him concerning this case "on perhaps twenty occasions" and "probably ten phone calls in addition." These discussions took place before and after the pretrial conferences. Although no pretrial motions were filed by the petitioner's counsel, the state's attorney handed this defense attorney his entire file and he "read it—every single page, both front and back." See *State v. Nelson,* 38 Conn. Sup. 349, 351, 448 A.2d 214 (1982); cf. *Siemon v. Stoughton,* 184 Conn. 547, 554, 556, 440 A.2d 210 (1981). He spoke with the petitioner and the wife, son and daughter of the petitioner and also visited the scene of the crimes charged. He decided that the only witness he would call at trial would be the petitioner himself.[4]

The petitioner sat by his attorney's side during the entire trial and frequently consulted with him; this included suggesting questions to be asked, which the petitioner would write on a pad. He was also "one hundred percent" involved in jury selection, consulting with the attorney on each prospective juror. One potential juror was challenged because that person was unacceptable to the petitioner. Just before evidence was presented the court granted a motion by defense counsel that the witnesses be sequestered.

---

[4] He admits that he announced to the jury panel that the petitioner's daughter, Susan Levine, would be called as a witness.

Upon examination of the trial transcript and that of the habeas hearing, it is abundantly clear that credibility was key and that self-defense was the theory of the defense. Duchaine, who worked on heavy construction, on cross-examination maintained that he had never been "angry" with the petitioner nor had "cross words" with him. Duchaine said that right after he had placed the dog droppings on the petitioner's property, the petitioner swore at him. During that part of the "conversation" he said that he did not have the shovel in his hand but that it "was behind me" as "I threw it down." On cross-examination, he denied making any comments about the petitioner's "parentage."

Robert Mandulak admitted on cross-examination that he had complained to the police "probably less than" five times about the petitioner in the past. He also admitted at that time that his wife had done the same and as a result the petitioner was arrested. In addition, his cross-examination disclosed that the petitioner had turned him in to the local building department "a number of times" and that the petitioner had brought a civil suit against him in which he filed a counterclaim. Robert Mandulak,[5] who had lived right next to the petitioner for approximately four years, also said on cross-examination that he had never spoken to the petitioner and that "[w]e were never friendly." On that examination, he indicated that he did not hear anyone threaten the petitioner, make any gesture toward him or "raise their hands."

Examination of Michael Mandulak, Robert's brother, disclosed that he did not live in Newtown but that he was there simply helping his brother work on his house. While working on that house, Michael and Robert heard Duchaine call Robert. Michael then saw the petitioner and Duchaine facing each other and they were talking

---

[5] Robert Mandulak's father-in-law, Thomas Constandilo, was also at the scene of the incident but he did not testify at the trial.

"loud," but he "didn't really hear what they were saying." Just before the petitioner struck Duchaine with the garden hose, the latter, he said, had a shovel "by his side . . . it was on the ground and he was just like holding the handle." On cross-examination, defense counsel noted that this witness wore eyeglasses. He elicited that he "always" wore them and that he needed them "to see distance." When Michael testified that he was approximately twenty feet away from the petitioner at that time, on cross-examination defense counsel asked what he had observed, including whether Duchaine was wet or not from the garden hose the petitioner was using to water his flowers. He said that he was "not sure" and also said that he did not think that anyone used the words "we've got him [the petitioner] now."

Harry Noroian, a Newtown police detective assigned to investigate this incident, was the final state's witness at the trial. He took signed statements from Duchaine and the petitioner. Cross-examination elicited that he detected "a mild odor of alcohol" on Duchaine when he responded to the complaint fifteen to twenty minutes after its receipt. Defense counsel asked him if he knew whether there had been a complaint to headquarters earlier that day concerning the petitioner and Duchaine. At that time, Noroian indicated that Duchaine had called him earlier that afternoon about a question and that he did not recall whether the petitioner's wife had also called to the police department earlier that day. In response to a question by defense counsel, he said that the police department records, "the log book," would show if anyone had made a complaint concerning Duchaine the day of the incident involved.

The petitioner was the only witness produced by the defense. On direct examination, he said Newtown police officer Koch came to his home on the day of the inci-

dent because the petitioner's wife had called Detective Noroian to complain that Mrs. Duchaine earlier that day "had attempted to hit me with her [motor] vehicle while I was walking a dog on the road." Koch, he said, suggested that he should not file the complaint, because to do so "was just going to put more fuel on the fire because of the problematic situation on the street."[6] He maintained that not only did Duchaine act "angry" toward him and use "bad words," which were "threatening words," but also that Duchaine threw the dog droppings "all over me." It was right after this that he felt he was going to be struck with the shovel because Duchaine "raised it above his head." It was then when they were face to face and "he had the shovel raised in his hands" that he struck him with the hose.

Further questioning adduced testimony that Duchaine said "he was going to kill me" if the petitioner's dog repeated the earlier performance. After being struck, Duchaine fell to the ground, dropped the shovel and called Robert Mandulak to come and help him. Counsel developed that, while Duchaine was on the ground and the two Mandulaks[7] came out of their driveway, the petitioner did not feel threatened by all three of them. It was only when Duchaine picked up the shovel, "yelled to them . . . '[l]et's get 'em' and came at me" that the petitioner pulled out his pistol and told them "to stay back or I would shoot them." With the loaded pistol in his hand, he told them that "I have enough in here for all of you." He "certainly" felt that he had an excuse for pulling out the pistol because "my life was threatened with this guy trying to hit me with the shovel raised over his head coming

---

[6] He also said that "several attempts had been made to hit me with the Mandulak's car and the Duchaine car and there are police complaints and reports on these several incidents," all of which he said occurred before July 24, 1981, the date of the charged incidents.

[7] The petitioner testified that he did not see Robert Mandulak's father-in-law.

at me." His counsel asked if he felt that he was "in eminent [sic] danger of being struck with the shovel" and he opined that he "was protecting myself, as well as my daughter [who] was behind me." He further inquired whether, when Duchaine "backed off," the petitioner then followed him and tried to continue "this confrontation." The petitioner replied: "At any time during the confrontation I was constantly backing into my driveway away from this guy and I was at my driveway initially." Defense counsel asked him if he felt that he had any other course of action at that time to avoid injury to himself. He replied: "Well, the only course I could have had was to turn my back and run into the house and possibly have him embed the shovel into my head."

During the hearing on the habeas corpus petition, the petitioner called three witnesses: his trial defense counsel; Susan Levine, the petitioner's daughter; and an attorney offered as an expert.[8] The petitioner's trial counsel testified that the theory of the defense at trial was that of self-defense to all the charges. He said that he tried to show that Duchaine was, in effect, the aggressor, threatening the petitioner with the shovel. He did not object to the state's question to the petitioner whether or not he would have shot the pistol dur-

---

[8] At the habeas hearing, an attorney of twelve years experience, offered as an expert, testified on behalf of the petitioner. He testified that most of his practice was in the criminal area. He had reviewed the trial transcript and it was his expert opinion that the petitioner's trial counsel had not in this case "met the standards of someone who tries these cases on an even infrequent basis." He elaborated on the bases of this opinion. In addition, he agreed that the key issue in the case was credibility, that developing the prior relationships of the state's witnesses was appropriate trial strategy, and that it was to the petitioner's advantage for his trial counsel "to portray this as basically a neighborhood quarrel as opposed to your average crime in the street." He agreed that "sometimes a jury is as impressed or unimpressed by the demeanor of a particular witness, perhaps the accused, as it is by the evidence that they have heard" and "perhaps that might contribute to a conviction." His testimony presented an issue of credibility for the habeas court to pass upon.

ing the confrontation "because it went to the heart of my claim for self-defense." The reason for cross-examining Duchaine about the "short-handled" shovel used by Duchaine was to try to show it was a "dangerous instrumentality." Further, he maintained that a number of his inquiries or occasional lack of inquiry were to show such things as the following: "prior animosity between the families"; "bad blood between the people living on Lyrical Lane"; "preexisting animosity"; "animosity"; "a running feud"; that the meeting of Duchaine and the Mandulaks prior to Noroian's arrival at the scene after the incident had been "rehearsed"; and that the alleged victims "were going to avenge themselves on Mr. Levine as a way of settling old accounts and that they were going to use the judicial system and the Police Department to do this." The trial defense counsel also attempted to color a witness' testimony or to bring Duchaine's credibility into doubt; to establish contradictions; and to give the petitioner the opportunity to explain a matter himself before the state asked the question which he had anticipated. He said that he asked certain questions because "I wanted to ask a whole series of questions showing previous animosity." He indicated that he made the motion to sequester the witnesses because he "didn't want them listening to each other's testimony and then going out in the corridor and polishing the testimony that was yet to be delivered." His questions to the petitioner concerning his military service with an honorable discharge and his family, including one son who was a police officer, were intended to cast him in a favorable light. Certain of his inquiries or occasional lack of inquiry were for purposes that reflect a pragmatic sensitivity to a fairly predictable reaction of a jury in a case of this nature. Defense trial counsel did testify that on hindsight he might have done a few things differently.

In his brief, the petitioner criticizes the failure to call his daughter, Susan Levine, as a witness at the trial. Susan Levine, who was seventeen years old, testified at the habeas hearing. On direct examination, she stated that she was present during the entire incident and that she had started to tell the petitioner's trial counsel about it when he came to their home. Once she told him about how Duchaine "raised the shovel to my father," she maintained that he stopped the discussion. She also said that the petitioner told her that she was going to testify, but that her father had talked to his counsel and the latter had told him that it was not necessary. On cross-examination, she was asked whether she told counsel that she was outside her house and saw the whole thing and she replied: "To tell you the truth, I don't think he ever asked me." Although she maintains that she was there when the police took a statement from the petitioner, they did not take one from her.[9] At the same hearing, the petitioner's trial defense counsel said that he had asked Susan if she had witnessed the alleged violence; she told him that she had been there earlier but not at that time and he did not call her as a witness.[10] To add to the conflicting testimony here, Robert Mandulak was asked at the trial who was there and he did not include Susan. This issue presented a question of credibility to the trial judge at the habeas hearing which he was required to resolve and could have resolved against the petitioner. Moreover, going to a claim of prejudice here, our examination of the trial court's charge shows that there was no instruction that the jury might draw an unfavorable inference from her failure to testify. See *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 165 A.2d 598 (1960).

---

[9] Apparently the police took statements from the petitioner, Duchaine and both Mandulaks.

[10] See footnote 4, supra.

Much is made by the petitioner of trial counsel's failure to produce a copy of the Newtown police log of the day in question to show the existence of a complaint made by the petitioner. This failure, he asserts, enhanced the credibility of Detective Noroian and "adversely and prejudically" affected the credibility of the petitioner because he had testified to the existence of such a complaint. It might well have been prudent for trial counsel to have produced the log, but its absence, under the circumstances, hardly has been shown to have contributed to the conviction. See *State v. Clark,* 170 Conn. 273, 283, 365 A.2d 1167, cert. denied, 425 U.S. 962, 96 S. Ct. 1748, 48 L. Ed. 2d 208 (1976). It is claimed that trial defense counsel should not have let evidence come in that the petitioner had a number of guns. Although trial defense counsel conceded that such questioning was irrelevant, we point out that "[t]he decision of a trial lawyer not to make an objection is a matter of trial tactics, not evidence of incompetency." *In re King,* 133 Vt. 245, 250, 336 A.2d 195 (1975); see *People* v. *Walker,* 22 Ill. App. 3d 711, 715, 318 N.E.2d 111 (1974).

The petitioner also complains that his trial counsel's "simple acquiescence" in the trial judge's "improper restraint on the right to cross-examine [Duchaine] . . . clearly prejudiced [him] in the eyes of the jury by indicating that relevant issues were being abandoned." This has no credible basis in the record. *After* cross-examining Duchaine, counsel stated that he had concluded "my questioning of this witness" but that he wanted "to reserve the right to request him again before the trial is finished on redirect." The trial judge said: "No reservations. You have one chance and this is it," to which counsel indicated that he had concluded his questions. At the habeas hearing, when asked about this, he testified that he had no more questions at that time or he would have asked them, but that he wanted

to hear the rest of the evidence in order "to keep the door open." While he did not take an exception, as the petitioner now points out, trial counsel's conduct, from the vantage point of trial tactics and strategy, is not subject to criticism under a fair view of all the circumstances. Observing a "lawful direction" of the court does not tend to make for ineffective assistance of counsel. See *Hindman* v. *State,* 597 S.W.2d 264, 272 (Mo. App. 1980).

We have examined the court's instructions to the jury and agree that it was "more than fair" to the petitioner and we note that he raises no claim concerning those instructions. We note just two things concerning the instructions: the charge on self-defense was fair to the defendant, and the trial court took trial counsel's requests to charge "verbatim."

Earlier, we have pointed out the guidance afforded by *Strickland* and other decisional law in assessing a claim of ineffective assistance of counsel. We agree with the New York Court of Appeals when it said: "What constitutes effective assistance [of counsel] is not and cannot be fixed with yardstick precision, but varies according to the unique circumstances of each representation." *People* v. *Baldi,* 54 N.Y.2d 137, 146, 429 N.E.2d 400, 444 N.Y.S.2d 893 (1981); *People* v. *Harper,* 43 Ill.2d 368, 374, 253 N.E.2d 451 (1969). Even before *Strickland,* we had said that "[h]indsight is irrelevant"; *Siemon* v. *Stoughton,* 184 Conn. 547, 554, 440 A.2d 210 (1981); and that "[h]indsight will almost always reveal possible alternatives in trial tactics," so that the claim of ineffective representation must be examined as of the time the questioned representation occurred. *Gentry* v. *Warden,* 167 Conn. 639, 647, 356 A.2d 902 (1975). The *Baldi* court also said: "Hindsight should not escalate what may have been a few tactical errors into ineffective assistance of counsel." *People* v. *Baldi,* supra, 151; see *Adams* v. *State,* 430 N.E.2d 771, 775 (Ind. 1982);

*Talley* v. *State,* 442 N.E.2d 721, 724 (Ind. App. 1982); *State* v. *Pullen,* 266 A.2d 222, 230–31 (Me. 1970); *People* v. *Jackson,* 52 N.Y.2d 1027, 420 N.E.2d 97, 438 N.Y.S.2d 299 (1981). It must be underscored that the effectiveness of counsel is not to be measured by the outcome of the trial. See, e.g., *United States* v. *Miller,* 643 F.2d 713, 714 (10th Cir. 1981); *United States* v. *Hammonds,* 425 F.2d 597, 601 (D.C. Cir. 1970); *State* v. *Garcia,* 141 Ariz. 97, 102, 685 P.2d 734 (1984).

In this case, the petitioner's trial counsel advanced and pressed a defense of substance, i.e., self-defense. He also competently attacked the credibility of all the state's witnesses. The record reflects a commitment from the outset to the cause of his client whose candor and demeanor were for the jury to evaluate. The petitioner has certainly failed to demonstrate, as he must, not only that his trial counsel's representation was ineffective but also that any "lack of competency" contributed to his conviction. *Williams* v. *Manson,* 195 Conn. 561, 564, 489 A.2d 377 (1985).

His constitutional right to effective assistance of counsel, however, does not mean that he is "entitled to an attorney who will make no mistakes." *United States* v. *Campbell,* 616 F.2d 1151, 1152 (9th Cir. 1980). We are keenly aware that the United States Supreme Court's decision in *Gideon* v. *Wainwright,* 372 U.S. 335, 339, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963), recognized that the fountainhead of this right is the specific sixth amendment guarantee of the right to assistance of counsel made obligatory upon the states by the due process clause of the fourteenth amendment. See, e.g., *Palmer* v. *Adams,* 162 Conn. 316, 294 A.2d 297 (1972). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just

result." *Strickland* v. *Washington,* 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This petitioner had a fair trial; *Strickland* v. *Washington,* supra, 687, 688; and he has not sustained his burden of proving a violation of his constitutional right to the effective assistance of counsel under either the United States constitution or the Connecticut constitution.

The petitioner's remaining claims do not require discussion. It is sufficient to note that we have examined them carefully and conclude that they are without merit. See *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole,* 189 Conn. 518, 538, 457 A.2d 656 (1983).

There is no error.

In this opinion the other judges concurred.