[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action is a petition seeking habeas corpus relief from allegedly unlawful confinement resulting from a judgment of conviction, after a jury trial, for felony murder and larceny second degree, for which judgment the petitioner received a total, effective sentence of eighteen years to life imprisonment. This judgment was affirmed on direct appeal, State v. John, 210 Conn. 652
(1989).
Specifically, the petitioner, in his amended petition, claims that his confinement is unlawful because his trial counsel, Attorney Abraham Washton, rendered ineffective assistance by inadequately investigating the petitioner's case; by inadequately cross-examining a prosecution witness; by inadequately presenting defense testimony; and by failing to move to sever the petitioner's criminal trial from that of a codefendant, Erich Seebeck.
Our Supreme Court has adopted the two-pronged Strickland test for evaluating ineffective assistance claims, Johnson v.Commissioner, 218 Conn. 403 (1991), p. 425. Under this standard, the petitioner must prove both that his trial attorney's performance was deficient, and that this deficient performance prejudiced his defense, Id. p. 424. If it is easier to dispose of the claim on the ground of insufficient prejudice, the habeas court need not address the question of counsel's performance, Pelletierv. Warden, 32 Conn. App. 38 (1993), p. 46. Because the court concludes that an examination of the prejudice component of theStrickland test is dispositive, the court proceeds to address that issue directly.
In order to satisfy the prejudice prong of the Strickland
test, the petitioner must prove, by a preponderance of the evidence, that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different, Levine v. Manson, 195 Conn. 636 (1985), p. 640. Reasonable probability means a probability sufficient to undermine confidence in the verdict, Bunkley v. Commissioner,222 Conn. 444 (1992), p. 454; that is, the petitioner must show that there is a reasonable probability that he remains burdened by an unreliable determination of guilt, Id. CT Page 12529
An examination of the transcripts of the petitioner's criminal trial reveals the following. On the morning of June 24, 1980, the victim's cousins found his body in the rear yard of his home in Waterford. Physical evidence at the scene disclosed that the victim had been in a struggle and that his body had been dragged across the yard. A witness recalled seeing two young men dragging something across the yard at about the time of the victim's demise. The only door to the victim's house was locked and his car was missing. No house or car keys remained at the scene. The victim's trouser pockets were pulled inside out. A distinctive copper bracelet was found, and the bracelet was broken and slightly mangled.
The victim's abandoned car was located by the New York State police along Interstate 84 in Brewster, New York, at 5:15 p. m. on June 19, 1980. The victim's house and car keys were discovered nearby. The drive from the victim's residence to Brewster is around two and one-half hours. Fingerprints were discovered on the abandoned car which matched those of the petitioner and Seebeck.
On or about 10 a.m. on June 19, 1980, the victim spoke by phone to a veterinarian who was treating the victim's dog. At noon on that date, the victim also spoke over the phone to a friend, and the victim mentioned that two young men with a motorcycle were then visiting him. Because of the visitors, the victim told his friend he would call the friend back in a half hour. Having received no return call at 12:30 p. m., the friend called the victim's residence, but his call went unanswered.
A few days before June 19, 1980, Seebeck told the petitioner and another acquaintance that he needed to flee Connecticut because of unrelated criminal charges he was then facing. Seebeck also remarked that he believed he could acquire a getaway vehicle from a "seventy year old queer in Waterford." The victim, an older man, had a reputation as a homosexual.
On June 24, 1980, the same day the victim's body was discovered, Seebeck and the petitioner were hitchhiking along Interstate 80 in Ohio when a passing motorist stopped to give them a ride. The motorist drove himself and the hitchhikers to his parent's home in Iowa. During the trip, the motorist observed that neither passenger carried any belongings. This observation prompted him to inquire as to how Seebeck and the petitioner had arrived in Ohio. They replied that they had driven by car from CT Page 12530 Connecticut but abandoned the car when it ran out of gasoline. This abandonment struck the motorist as odd and caused him to ask if the car had been stolen. The petitioner responded that the owner of the car had died a couple of days before they took the vehicle. Seebeck commented that the owner had died of old age.
 I
The court first addresses the issue of Washton's failure to move for severance of the criminal trial of the codefendants. Washton, in fact, objected to any such severance. In his postrial [posttrial] brief, the petitioner acknowledges that joint trials of codefendants are the rule and separate trials the exception, Statev. Smith, 201 Conn. 659, 669 (1986). Severance is not "to be had for the asking," State v. Banta, 15 Conn. App. 161, 167 (1988). The movant has the burden of demonstrating that substantial prejudice will result from a joint trial, State v. Douglas,10 Conn. App. 103, 123 (1987).
In the present case, the petitioner's sole claim of prejudice is that he was tried with Seebeck. He argues that certain evidence against Seebeck was stronger than against him, and, therefore, he suffered substantial prejudice. The petitioner articulates no antagonistic defenses between the codefendants, nor can he point to evidence admissible against Seebeck but not against himself. His supposed prejudice is founded strictly on the comparative strengths of the cases against himself and Seebeck.
A similar argument was recently rejected by our Supreme Court. In State v. White, 229 Conn. 125, 160 (1994), that Court held that the "incidental impact" on a defendant's case of the strength or weakness of the case against a codefendant is insufficient to warrant severance of a joint trial. The Court reiterated the legal principle that substantial prejudice means more than a joint trial will be less advantageous to one of the defendants, Id, 161.
The court finds that the petitioner has failed to meet his burden of proving, by a preponderance of the evidence, that there exists a reasonable probability that the trial court would have granted such a motion or that, but for the joint trial, the outcome of the petitioner's criminal trial would have been different.
 II
The petitioner also contends that Washton mishandled the CT Page 12531 examination of certain forensic entomologists who testified at his criminal trial. The prosecution presented the testimony of Dr. Wayne Lord, a medical entomologist, who used the habits and life cycle of a species of blowfly to reach an opinion as to the probable range for the time of death of the victim. The defense presented the testimony of Dr. Bernard Greenberg, a professor of entomology, and Dr. William Krinsky, a medical entomologist, regarding the same topic. All three entomologists are highly versed in the study of blowflies. Their testimony was relevant because of the presence of blowfly maggots on the victim's corpse when it was discovered on June 24, 1980.
The petitioner complains that Washton inadequately questioned Dr. Lord as to his method of estimating maggot length from autopsy photographs and his opinion regarding the time lapse between death and oviposition by blowflies. The significance of these opinions is that maggot length indicates maggot age, and the lapse of time between death and the laying of blowfly eggs is necessary to calculate the time of death.
 A.
In 1980, the medical examiner who autopsied the victim's body was ignorant of entomological factors bearing on the establishing of time of death, as well as for other forensic purposes. Because of this ignorance, the maggots present on the victim's corpse were discarded by the medical examiner. Consequently, the entomological experts had to rely on postmortem photographs to study the maggot activity which had occurred up to the time the photographs were taken.
The lack of specimens necessitated that the entomologists resort to alternative methods of ascertaining the length of the maggots depicted photographically. Dr. Lord chose to compare the length of particular maggots to the width of one of the victim's incisors which was visible in the photograph. Dr. Lord measured that incisor and made a survey of incisor width among colleagues to obtain an average size which he then employed in estimating maggot length Dr. Krinsky, on the other hand, chose to use a button on the victim's shirt which was also visible in the photograph. Dr. Krinsky obtained the shirt and measured the button. He used this measurement to estimate the length of the maggot under scrutiny.
The petitioner contends that Washton ought to have explored the impropriety of Dr. Lord's methodology: using tooth width as a CT Page 12532 reference length. The court has carefully reviewed the transcript of Dr. Lord's testimony and finds that this issue was raised and explored sufficiently at trial to make the jury conscious of the controversy over maggot length approximation. Dr. Lord explained that he preferred using the victim's tooth instead of the button as a reference tool because the button was at an angle to the plane of the photograph making the button diameter less useful for comparison (Petitioner's Exhibit A-4, pp. 30 and 31). Washton cross-examined Dr. Lord as to his use of tooth size to estimate maggot length (Petitioner's Exhibit A-2, p. 65 ff). He also questioned Dr. Krinsky regarding his use of a shirt button for this purpose (Petitioner's Exhibit A-3, p. 603 ff).
Most significantly, all three experts agreed as to the developmental stage the maggots under scrutiny had reached despite the use of different reference guides in measuring maggot length. Also, all three experts concurred in their opinion that the blowfly eggs which matured into the maggots in the photographs were probably deposited on the victim's corpse during the afternoon of June 21, 1980. Given these concurring opinions, the court finds that more extensive questioning of these witnesses as to how they arrived at these conclusions would have produced little of benefit to the petitioner's case.
 B.
The second area of dispute among the entomologists concerned the span of time which may have elapsed between the moment of death and the arrival of blowflies and oviposition. Dr. Lord stated that the species of blowfly in question is inactive at night and during periods of overcast sky and precipitation. Dr. Greenberg and Dr. Krinsky agreed that these blowflies are inactive at night but disagreed that light rain or overcast weather will curtail activity. Rain fell on June 20, 1980, and Dr. Lord opined that it was reasonably possible that the victim's body was immobile for hours or even a day before blowfly eggs were hid upon it. Dr. Krinsky discounted the inclement weather as a factor of delay. Both entomologists, however, found the most likely time of death was June 21, 1980, based strictly on the blowfly evidence. Their major difference of opinion was that Dr. Lord allowed for the reasonable possibility of an earlier death because of the unfavorable weather conditions. The court finds that Washton thoroughly explored this area of dispute when he questioned these witnesses. CT Page 12533
In any event, the entomological evidence as to time of death in this case was of diminished importance because of the abundance of other available evidence bearing on the time of death. The victim spoke to his veterinarian at 10 a.m. and to a friend at noon on June 19, 1980. His stolen car and stolen keys were located in New York at 5:15 p. m. on the same day. Two men were seen dragging something across the victim's yard on the same date. The time to drive from the victim's residence to Brewster, New York, is two and one-half hours. The inescapable conclusion is that the victim was killed between noon and 2:45 p. m. on June 19, 1980.
Seebeck had announced his plan to obtain a getaway car from someone matching the victim's description. Seebeck's copper bracelet was found, apparently ripped off during a struggle, at the homicide scene. Seebeck and the petitioner's fingerprints were on the victim's car, and they admitted driving it to New York. They also spoke of and were aware of the victim's death despite the fact that the victim's body was only discovered that same day.
The court finds that the petitioner has failed to meet his burden of proving, by a preponderance of the evidence, that a more elaborate examination of the entomologists would have altered the outcome of his criminal trial.
For these reasons, the petition is dismissed.
Sferrazza, J.