[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This habeas action was commenced by petition dated August 17, 1990. Subsequently, by pleading dated October 4, 1994, the petitioner filed an Amended Petition in which he alleges that his, confinement by the Commissioner of Corrections is illegal on the basis that he was denied the effective assistance of counsel at his criminal trial. The court heard this matter at an evidentiary hearing on November 29, 1995 and December 12, 1995. In addition to the testimony of witnesses, the hearing on this matter included the, submission by the petitioner of the transcript of his criminal trial. cf. Petitioner's Exhibit A (herein after referred to as T). Based on all the evidence adduced at the habeas hearing, the court makes the following findings and order.
On April 10, 1989, the petitioner was convicted following a jury trial of one count of Manslaughter in the First Degree in violation of C.G.S. § 53a-55 (a)(1), three counts of Attempted Assault in the First Degree in violation of C.G.S. §§ 53a-49 and53a-59 (a)(1), and one count of Conspiracy to Commit Assault in the First Degree in violation of C.G.S. §§ 53a-48 (a) and 53a-59 (a)(1), and one count of Conspiracy to commit Manslaughter in the First Degree in violation of C.G.S. §§ 53a-48 (a) and 53a-55 (a)(1). Subsequently, the court sentenced the petitioner to terms of confinement of twenty years on each conviction with the terms to run concurrent for a total effective sentence of twenty years confinement. The petitioner is currently an inmate in the custody of the Commissioner of Corrections. CT Page 1365-EEE
On appeal to the Appellate Court, the petitioner's convictions on the conspiracy charges were reversed while the remaining convictions were upheld. cf. State v. Montgomery, 22 Conn. App. 340
(1990).
Also arrested in conjunction with the events leading to the place before the commencement of the petitioner's criminal trial, was convicted of Accessory to Manslaughter in the First Degree.
In his Amended Petition the petitioner claims that his trial counsel was ineffective in that he failed to proffer valid objections to the State's questions of witnesses offered to establish his presence at the crime scene and his counsel failed to adequately impeach witnesses presented by the State who attempted to establish his presence at the crime scene.
At trial the petitioner was represented by Attorney Otto Witt and the State was represented by Assistant State's Attorney Herbert Carlson. Mr. Witt, who testified at the habeas hearing, obtained his law degree from Case Western University in 1977 and has been licensed to practice law since 1981. At the time of his representation of the petitioner his practice included the; representation of criminal defendants. Prior to the petitioner's trial, Mr. Witt had handled nine criminal trials, two of which had been before a jury. In this matter he had been retained privately by the petitioner's family on his behalf.
At the criminal trial, the State offered evidence that on the evening of November 17, 1987, the victim, Otis Pierce, had driven to Van Block Avenue in the vicinity of the Dutch Point housing project in Hartford with his brother Jerry Lee Pierce, Bennie Pierce, and Bobby Shipman. T. 32. While they were standing by their car talking, another group of males appeared. Jerry Lee Pierce saw that one of the men was holding a hand gun and recognized him as "Doonie" a street name for Lorne Dyson. Shortly thereafter Jerry Lee Pierce heard the sound of gun shots and noted that his brother Otis had fallen to the ground and had been shot in the head. Otis Pierce subsequently died in the hospital from his gun shot wound. Bennie Pierce testified that he saw two males with two pistols. T. 78. He recognized one of the guns as a twenty two and the other as a thirty eight. T. 79. He testified that he heard shots coming from each of the guns, a determination he was able to, make because of the different sounds of the shots from each gun. T. 83. While neither Jerry Pierce nor Bennie Pierce were able to identify the petitioner as among the group of men from whom the CT Page 1365-FFF shots came, Bobby Shipman testified that he saw the petitioner as one of three men, including "Dooney", in the area from which the gun shots came. T. 58.
Also called by the State to testify at the criminal trial were Kelly Plummer and Cheryl Moreno, both friends of the petitioner. Plummer testified that she has a child by the petitioner and that she and Moreno were with the petitioner in the area of the Dutch Point housing project on the evening in question when a gun went off accidentally in the petitioner's pocket. T. 105. Plummer observed the petitioner remove the gun and unload it. T. 109. Shortly thereafter Plummer and the petitioner were joined by Lorne Dyson and another individual whose last name is Kyler. Plummer observed the petitioner and Dyson walk away from her. She testified that shortly after she heard gunshots and then saw the petitioner and Dyson running in her direction and then go into the basement of a building.
During his direct examination of Plummer, the Assistant State's Attorney requested and obtained permission from the Court to examine her concerning the contents of a statement she had given to the police shortly after the shooting. The petitioner claims that Mr. Witt failed to properly object to Mr. Carlson's leading questioning of Ms. Plummer. From the court's review of the transcript of Mr. Carlson's examination of Ms. Plummer, it is apparent that she was a reluctant witness for the State. When he attempted to refresh her recollection by the use of a statement she had previously given the police, she attempted to disavow the contents of the statement with the claim that she had been threatened by the police. Since Ms. Plummer's testimony was, in some respects, at variance with her earlier statement to the police, Mr. Carlson was granted permission to examine her concerning her statement. "A prior written inconsistent statement may be used at trial for substantive as well as impeachment purposes where the statement is signed by a declarant who has personal knowledge of the facts stated therein and who testifies at trial and is subject to cross-examination." State v, Whelan,200 Conn. 743 (1986). The petitioner is accurate in his claim that Mr. Witt did not object to Mr. Carlson's request to cross examine Ms. Plummer concerning the contents of her earlier written statement and to utilize its contents as substantive evidence. T. 127-128. Counsel is not required to make unfounded objections. In this case, it is clear that the prerequisites for the application ofWhelan had been met. During his examination, Mr. Carlson was able to bring out that Ms. Plummer had told the police that before the CT Page 1365-GGG shooting while the petitioner and Dyson were together both of them pulled out their guns from their pants, that the petitioner looked at his and made sure that it was loaded and that the petitioner said, "Let's just scare them." T. 132-133. Ms. Plummer then admitted that she had stated in her written statement that the petitioner and Dyson then walked down a path which led to a dumpster, that she then heard four to six gunshots which were different types of shots. T. 133. She also admitted that her statement included a statement that, "Seconds later I saw Junior and Dooney running towards us carrying the guns in their hands." T. 133. In her testimony she had identified "Junior" as a street name for the petitioner. Ms. Plummer also acknowledged that her written statement contained a statement that shortly after she had seen them running down the path and into the basement of a building where the petitioner had changed his jacket, he and Dyson returned and she heard the petitioner say, "I don't believe that we did this. We shouldn't have done that. I don't want to go to jail." T. 134.
While it is true that Mr. Witt did not object to Mr. Carlson's leading questions, it was proper cross examination of a witness whom he had been given the permission to impeach with her prior written statement. His objections would have been fruitless.
The State also called Cheryl Moreno, who had been in the company of Kelly Plummer during the evening in question. Ms. Moreno had also given a written statement to the police. During his examination of Ms. Moreno, Mr. Carlson afforded her the opportunity to review her written statement to refresh her recollection. The petitioner claims that Mr. Carlson should not have been able to use Ms. Moreno's statement in this way without first showing that her recollection needed to be refreshed. From a review of the trial transcript, the court finds that Mr. Carlson properly utilized Ms. Moreno's prior written statement. It was first brought up on her direct examination when Ms. Moreno testified that the petitioner did not say anything at a certain time. Mr. Carlson afforded Ms. Moreno the opportunity to review her prior statement to determine if that would refresh her recollection. She read it to herself and then answered that reading the statement did in fact help her remember whether the petitioner had said something at the relevant time. Having had the opportunity to have her recollection refreshed, the witness then changed her answer. T. 227-228. On several occasions, Ms. Moreno indicated that reading her statement had refreshed her recollection. Having had her recollection refreshed, she was able CT Page 1365-HHH to testify concerning relevant aspects of the petitioner's conduct just before and shortly after she heard gunshots. Her testimony was damaging to the petitioner. The examination, however, was proper. Mr. Carlson utilized Ms. Moreno's prior written statement in an appropriate manner; his questions were properly posed. Contrary to the assertions of the petitioner, the court does not find that Mr. Witt improperly failed to object to the manner of Ms. Moreno's questioning by the State.
In addition to the portions of the trial transcript notedsupra, the court has reviewed the entire transcript to examine the petitioner's general claim that Mr. Witt failed to proffer valid objections to the State's questions. The claim is unfounded. Where there appeared to be any useful purpose, Mr. Witt's cross examinations were vigorous, and pointed.
The petitioner claims additionally that Mr. Witt failed to impeach witnesses presented by the State who attempted to establish the Petitioner's presence at the crime scene. In this regard, the court notes that the petitioner asserts that both Ms. Moreno and Ms. Plummer had been threatened by members of the victim's family at the time of the probable cause hearing, and he claims that the fact of these threats should have been brought out through Mr. Witt's cross examinations. This claim is without merit. At the habeas hearing, Mr. Witt acknowledged that he had been told of the threats. He indicated that he informed the Assistant State's, Attorney as well as the court but did not utilize this information in his examination of either Ms. Moreno or Ms. Plummer. The petitioner claims that counsel's failure to bring to the jury's attention the fact of these threats necessarily left the jury with the impression that the women's reluctance and hesitancy was due only to their desire to be helpful to the petitioner. The court will not engage in speculation. From a review of the witnesses testimony it is the court's view that it was their earlier statements to the police, as well as their obligations to be truthful under oath that damaged the petitioner. The court will not speculate that the jury would have viewed the testimony of either Mr. Moreno or Ms. Plummer differently if there had been testimony that they had been threatened by members of the victim's family after they had given their police statements.
At the habeas hearing, the petitioner also claimed that Mr. Witt's representation was ineffective because he failed to cross examine Jerry Pierce concerning a comment he was alleged to have made to the petitioner's mother, Sharon Montgomery, outside the CT Page 1365-III courtroom during the probable cause hearing. At the habeas hearing, Mrs. Montgomery testified that Jerry Pierce told her that he knew the petitioner had not shot his brother. She claims that she told Mr. Witt about this conversation before the commencement he knew the petitioner had not shot his brother. She claims that she told Mr. Witt about this conversation before the commencement of the trial. Mr. Witt testified that he does not recall being told about this conversation by Mrs. Montgomery prior to the trial. He claimed that he was not aware of this claim at the time Jerry Pierce testified but may have been told about this conversation approximately one year after the trial.
A review of the transcript reveals that Mr. Witt did not ask Jerry Pierce any questions about any conversation he may have had with Mrs. Montgomery prior to his testimony. Mr. Pierce's testimony, however, did not place the petitioner at the crime scene. He testified that a group of males had driven by in a Cadillac and then stopped nearby. He stated that the shots which killed Otis Pierce had come from this group. During his testimony, he did not identify the petitioner as one of the group of men from whom the shots came. When asked specifically if he had seen the petitioner in the Cadillac, he said "No." T. 50. And he indicated that he did not see the petitioner standing outside of the Cadillac when the other people were standing there. Id.
Assuming, arguendo, that Mr. Witt had been told by Mrs. Montgomery that Jerry Pierce had told her he knew the petitioner, had not been the one who shot his brother, it is not clear that it would have benefitted [benefited] the petitioner for Mr. Witt to have asked him about this purported conversation. Nor is it clear such a question would have been appropriate. Since Jerry Pierce did not place the petitioner at the crime scene during his direct testimony, an attempt to elicit from him the repetition of a not-inconsistent out-of-court statement he may have made would have been of questionable inadmissibility. Also, if Mr. Witt had asked the witness directly if he knew whether or not the petitioner had been the shooter he would have risked an answer less favorable than the status of the witness's direct testimony. Finally, the court notes that Jerry Pierce did not testify at the habeas hearing. Therefore, the court is unable to conclude, from the proffered evidence, precisely what he did say to Mrs. Montgomery or what he would have told Mr. Witt if he had been interviewed prior to his actual testimony.
The petitioner's final claim is that prior to the trial a CT Page 1365-JJJ person named James Givens told the petitioner's mother that Lorne Dyson had told him that the petitioner was not the one who had shot Otis Pierce, and that the petitioner had not been there. The petitioner claims that she gave this information to Mr. Witt prior to the trial and that he failed to make contact with Mr. Givens. Mrs. Montgomery also testified that Mr. Givens was ill with a kidney disorder at the time and that when she and a male friend went to pick up Mr. Givens to bring him to speak with Mr. Witt, she learned that Mr. Givens had been taken to the hospital and was not expected to live. At the habeas hearing, Mr. Witt testified that he had no recollection of Mr. Givens. The petitioner claims that Mr. Witt should have interviewed Mr. Givens prior to the trial and, that if such an interview had been conducted, Mr. Witt would have learned that Lorne Dyson had told Mr. Givens that the petitioner had not been involved in the shooting.
This testimony, even if it could have been obtained and proffered, would have been of doubtful vitality. Lorne Dyson was tried and convicted of the crime of Accessory to Manslaughter in the First Degree in conjunction with the shooting of Otis Pierce on the night in question. cf. State v. Dyson, 217 Conn. 498 (1991). During his trial, which was concluded prior to the beginning of the petitioner's trial, Dyson did not testify. Id. It is the petitioner's theory, therefore, that if Dyson had been called to testify at the petitioner's trial, he could have been asked, under certain circumstances, about his alleged statement to Mr. Givens. The flaw in this claim is that the petitioner failed to establish, at the habeas hearing, that Mr. Givens was available to Mr. Witt. To the contrary, Mrs. Montgomery's testimony that when she and a friend sought to bring Mr. Givens to meet Mr. Witt he was already in the hospital. The court heard no evidence that there was an unreasonable lapse of time from the date when Mrs. Montgomery first spoke to Mr. Givens to the date on which she told Mr. Witt of this claim.
In order to prevail on a claim of ineffective assistance of, counsel, a petitioner must prove that the representation of his lawyer was ineffective and that there is a reasonable probability, that, but for counsel's performance, the proceedings would have been different. Strickland v. Washington, 466 U.S. 688 (1984);Levine v. Manson, 195 Conn. 636 (1985). In reviewing the conduct of counsel at trial, the court must be wary of the lens of hindsight and should be highly deferential in its scrutiny of counsel's performance. Fair v. Warden, (citations omitted),211 Conn. 398 (1989). CT Page 1365-KKK
On the basis of the evidence adduced at the habeas hearing, including a review of the trial transcript, the court finds that the petitioner has failed to meet his burden of proving that his counsel's performance was ineffective. Accordingly, the petition is dismissed.
Bishop, J.