[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The petitioner, LeRoy Rowley, a black man accused of sexually assaulting Jadee H (Jadee), a white woman, was found in a trial by an all white jury guilty of one count of sexual assault in the first degree in violation of General Statutes § 53a-70a. The petitioner was sentenced on March 17, 1997 to a term of incarceration of 15 years, execution suspended after ten years with ten years probation. An appeal was filed but not pursued.[1] Thereafter, he petitioned for a writ of habeas corpus on the grounds that he had not received from his trial counsel, Attorney David Abbamonte (trial counsel), effective assistance of counsel guaranteed by the federal and state constitutions. The gravamen of the petitioner's claim is that trial counsel did not conduct an adequate investigation into the facts and failed to call a vital witness.[2]
It is helpful to set out the general law as it pertains to ineffective assistance of counsel. "The right to effective assistance of counsel is guaranteed by the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. This right is equally applicable whether defense counsel is court appointed or . . . privately obtained. Our cases demonstrate that [t]o succeed in his claim of ineffective assistance of counsel, the petitioner must show that his attorney's performance was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. We . . . have additional guidance on the petitioner's constitutional claim from the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668
(1984). In Strickland the Court, while holding that the Sixth Amendment right to counsel is one of effective assistance. nevertheless imposed a two-component showing before a claim of deprivation of that right may be made: first, it must be shown that the attorney's performance was so deficient and his errors so serious that counsel was not functioning as . . . counsel . . . and, second, that those errors functioned so as to deprive the defendant of a fair trial, a trial whose result is reliable . . . i.e., that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland stated not only that [j]udicial scrutiny of counsel's performance must be highly deferential but also that the reviewing court must indulge a strong presumption that counsel's conduct CT Page 9542 falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under these circumstances, the challenged action might be considered sound trial strategy. In fairly assessing the attorney's conduct it is required that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. The petitioner has the burden to demonstrate that counsel's conduct fell below the required standard and that lack of competency contributed to his conviction." Levine v. Manson, 195 Conn. 636, 639-640, (1985) (Citations omitted in part; internal quotation marks and paragraphing omitted).
As a preliminary matter the court must dispose of two smoke screens spread by the respondent, Warden in this case. First, the respondent points out that the petitioner failed to appear when he was first scheduled for trial on December 6, 1993. of course, this should have no bearing on his right to effective assistance of counsel at his subsequent trial. Second, before the petitioner failed to appear in 1993, his defense was that he was not the person who sexually assaulted Jadee. In 1997, after positive DNA evidence was gathered implicating him, the petitioner changed his defense from "it was not me" to "it was consensual sex for drugs." It is understandable why his original defense was "it was not me." He was not arrested for the sexual assault for nearly a year after Jadee filed her complaint.[3] Furthermore, Jadee's name was not disclosed in the warrant. She was referred to as the victim "Mary Smith" in order to protect her privacy. Jadee's name was disclosed only after trial counsel commenced his representation of the petitioner in 1997. Moreover, merely because there is a change in the theory of his defense, does not mean that a criminal defendant forsakes his constitutional right to effective assistance of counsel in a criminal trial that in fact does take place.
The petitioner was accused of sexually assaulting Jadee in the early morning hours of May 10, 1992 at 535-537 Carroll Street (535 Carroll St.) in the city of Bridgeport. The building at 535 Carroll is a three family house including the attic which was converted into an apartment. At the time of the incident, the first floor apartment, that has a separate entrance, was occupied by Margaret Greene also known as Margaret Spain (Greene/Spain). The second floor apartment, that shared an entrance with the third floor, was occupied by Bernice Sneal and her brother Levelle who was the boyfriend of Jadee, and the third floor apartment was occupied by Gerldo Brown, the fiance of Greene/Spain.
At the time of trial, Jadee testified she was babysitting in the second floor apartment at 535 Carroll Avenue and the petitioner came to the apartment twice. The first time was about 3:30 a.m. and he remained in the CT Page 9543 apartment for a few minutes. He came back at about 5:30 a.m. and she let him in. Jadee testified that she talked to the petitioner for about twenty minutes. Jadee further testified on direct examination by the state's attorney, as follows:
Q What were some of the things that you were talking about, ma'am.
 A He was stating that he wanted me sexually, and I told him that there was no way, and he said, now that he has revealed himself to me socially there is no way we could have a relationship without him taking care of it.
 Q Now, before he made these statements to you, how long was he in the apartment before this subject came up?
A About twenty minutes.
Q Did you have any discussions with him about leaving the apartment?
A Yes. I even called a cab for him.
Q And do you know if that cab arrived?
A Yeah, it came.
Q And what did you do when the cab arrived? What did you do —
A I went downstairs.
 Q Now, did the cab arrive after he had made these comments to you . . . just testified to?
A Uh-huh.
Q When you went downstairs, what was the purpose of you going downstairs?
A To tell the cab to wait.
Q What did you do at that point?
A Went back upstairs.
Q And what happened when you went back upstairs?
A I got jumped. CT Page 9544
Q When you say jumped, what do you mean?
A He threw me on the bed.[4]
The brief visit at 3:30 a.m. and the return at 5:30 a.m. fits a pattern of sex for drugs. Although there was sufficient evidence to allow his guilt to be a jury issue, the case was paper thin.
With respect to trial counsel, his lack of enthusiastic representation was clearly demonstrated. He never interviewed the petitioner privately in jail, and his only pre-trial communications were in the bull-pen in the courthouse where the attorney-client conversations could be overheard by others. He never discussed a defense with the petitioner until Jadee finished testifying. Although this does not constitute ineffective assistance of counsel, trial counsel effectiveness must be viewed through this lens.
Inadequate pretrial investigation and the failure to call an exculpatory witness can constitute ineffective assistance of counsel.Siemen v. Stoughton, 184 Conn. 547, 556 (1981).[5] Greene/Spain's name was given to Abbamente just before the commencement of jury selection as a witness by both the petitioner and his girlfriend, but she never testified. Her testimony would have been very compelling. She testified before this habeas court as follows: "One evening I was in the living room, I was watching television and I heard someone coming up the front so I pulled back the curtain on the front door because it is all glass and there I seen a young man and Jadee from upstairs and the young man had a brown bag under his arm, which I took to be a 6 pack of beer. So when they seen me look in they went into the small hallway. Once they went into the hallway I put my ear up against the wall to hear her say to him if you want me you're going to have to treat me right tonight and they were kissing in the hallway. Then the footsteps went up the stairs. I didn't hear anything else. The next morning my fiancee came down, I had made breakfast, he left, and when he left I heard someone come down the stairs. Again I went to the door and I looked to see a young man come out of the gate with a can of beer in his hand and he was wearing a Forty-Niner jacket and he opened the gate, went out the gate, he closed the gate, he got to the middle of the gate and looked up and waved. Now, before he got to the end of the driveway I didn't see anything else, I just got out of the window, went back to doing what I was doing. About maybe half an hour, not even half an hour, maybe about 20 minutes after that I heard someone else come down the stairs. I looked out the window again and Jadee came down stairs. She was on the porch. She looked this way, she looked that way, she went like this and she went back upstairs. About 25 minutes after that I think his name is Doc, he's one of her girlfriend's husband, he came over in his car. He went upstairs. A few CT Page 9545 minutes later 2 or 3 police cars came. I called Gerry and I said Gerry you have to come home because something is going on in your father's building, the police are upstairs. He asked the police when he came, I have to know what is going on because this is my father's building and I have to take care of the building. The police said someone was raped upstairs and I said to Gerry, I said, look, who was raped? And he said the cops said [Jadee] was raped. I said not from what I heard. That's it." of course, there were some inconsistencies with respect to her testimony but this was expected after several years.
The respondent claims that the trial attorney directed the investigator from the public defender's office, DeGrand, to interview Greene/Spain. The following undated note from DeGrand to trial counsel was introduced as an exhibit:
Dave [defense counsel]
Re: LeRoy Rowley
Ms. Green refused personal interview (spoke to her by phone).
Claims she didn't see or hear anything out of the ordinary. — in regard to this incident.
Does not want to be bothered with phone calls.
The respondent argues that Greene/Spain was not credible before the habeas court with respect to what she heard and observed on the morning of the incident because she had an altercation with Jadee on June 15, 1993. Bridgeport's Police Incident Report indicated an alteration occurred between Greene/Spain and Jadee approximately seven years before she testified before the habeas court. The respondent, on the other hand, urges the habeas court to believe that the investigator DeGrand contacted Greene/Spain after the jury selection commenced in January 1997 and she refused to cooperate, approximately three and a half years after the altercation with Jadee. The respondent's position is not consistent. Surely, Greene/Spain would have more ammus with respect to Jadee three and a half years after the altercation and would have had more of an incentive to testify at the petitioner's trial if she was contacted by DeGrand than she would have at this habeas proceeding seven years after the incident in 1993.
The habeas court finds, however, that Greene/Spain was not contacted and finds her testimony before the habeas court credible.
Nevertheless, even if the court was to accept the claim that DeGrand CT Page 9546 sought the testimony of Greene/Spain during the petitioner's trial, it would still have been ineffective assistance of counsel not to have compelled her testimony by issuing a subpoena. Jadee's alleged statement that "she didn't see or hear any thing" would have been important evidence for the jury. Jadee claimed at trial that she only opened the door for the petitioner during his second visit at 5:30 a.m. because "[h]e was beating on the door" and "[y]eah, after a while I answered the door because he wouldn't stop knocking on the door." The fact that Greene/Spain lived in the apartment below and would testify that "she didn't see or hear anything out of the ordinary", would have been significant in undermining the credibility of Jadee.
The court finds that it was ineffective assistance of counsel for the respondent's failure to call or subpoena (as the case maybe) Jadee as a witness. Simply put, this error was so serious "that counsel was not functioning as . . . counsel." Strickland v. Washington, 466 U.S. 668,689 (1984)
The second prong of Strickland — that is, the prejudice prong — requires that the petitioner prove "that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." Strickland v. Washington, supra,466 U.S. at 694. "In this context, a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, does not require the petitioner to show that counsel's deficient conduct more likely than not altered the outcome m the case. Rather, it merely requires the petitioner to establish a probability sufficient to undermine confidence in the outcome." (citation omitted; internal quotation marks omitted); Bunkley v. Commissioner,222 Conn. 444, 445-6 (1992).
Under either scenario — the testimony Greene/Spain before this habeas corpus or the claim by DeGrand that she told him that `She didn't see or hear anything,' — the failure to secure this testimony of Greene/Spain before the jury at the petitioner's trial was so serious as to deprive the petitioner of a fair trial and renders the conviction of sexual assault unreliable.
In sum, the court finds that the petitioner did not receive effective assistance of counsel, grants the writ of habeas corpus, vacates the original judgment and orders that the petitioner be given a new trial on the charge of sexual assault.
 ___________________________ BERDON, JUDGE TRIAL REFEREE CT Page 9547