## RANDY W. WILLIAMS *v.* WARDEN, STATE PRISON (14024)

SHEA, GLASS, HULL, BORDEN and F. X. HENNESSY, Js.

Argued December 14, 1990—decision released February 12, 1991

*William M. Bloss,* special public defender, for the appellant (petitioner).

*Susann E. Gill,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Mary Elizabeth Baran,* assistant state's attorney, for the appellee (respondent).

HULL, J. The principal issue in this appeal is whether the petitioner has established that his conviction of the crimes of first degree robbery and first degree burglary should be overturned because of ineffective assistance of counsel. Following a jury trial, the petitioner, Randy W. Williams, was convicted of robbery in the first degree, in violation of General Statutes § 53a-134 (a) (3),[1] and burglary in the first degree, in violation of General Statutes § 53a-101 (a) (1).[2] The trial court, *Hadden, J.,* imposed an effective sentence of twenty years imprisonment with execution suspended after ten years. The

---

[1] General Statutes § 53a-134 (a) (3) provides: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument."

[2] General Statutes § 53a-101 (a) (1) provides: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . (1) [h]e is armed with explosives or a deadly weapon or dangerous instrument."

petitioner appealed and this court affirmed. *State* v. *Williams,* 203 Conn. 159, 523 A.2d 1284 (1987).

Thereafter, the petitioner filed a petition for a writ of habeas corpus in the Superior Court. A hearing was held, but on the consent of the parties, the habeas court, *Axelrod, J.,* declared a mistrial. Following a second hearing, the habeas court, *Kaplan, J.,* dismissed the petition and the petitioner, upon the granting of certification, appealed to the Appellate Court. We subsequently transferred the appeal to this court pursuant to Practice Book § 4023 and we now affirm.

The facts underlying the petitioner's conviction are as follows. Just before 4 p.m. on January 24, 1985, the victim returned from grocery shopping to an apartment in New Haven where she was staying as a guest. While she was bringing her groceries into the apartment, she noticed a man knocking on the door of the apartment across the hall. The victim informed the man that the occupant of the apartment would not return from work until 4 p.m., and then went back outside to get her child whom she had left in a stroller. As she was returning to her apartment, the victim heard a sound from within the apartment across the hall, so she told the man that it appeared that the occupant might be home after all. The victim then proceeded to enter her apartment, and as she did, the man followed her inside and closed the door behind him. The man displayed a knife and grabbed the victim's purse from a couch. He then ran out of the apartment.

The victim immediately called the New Haven police. Shortly after the police had arrived, the victim described the perpetrator as a fairly dark black man, twenty-five to thirty years old, approximately six feet tall, with a thin moustache, a somewhat muscular build and bearing a shiny mark or scar on the left side of his face. She further stated that the perpetrator had

worn an olive green knit hat. After the victim gave this description, she went to the New Haven police station where she viewed an array of more than two hundred photographs in an attempt to identify the perpetrator. The victim positively identified the petitioner as the perpetrator, after she had selected two photographs of him from the array. Later, she also positively identified the petitioner in court.

In his habeas petition, the petitioner claims that he was deprived of effective assistance of counsel in violation of his federal constitutional rights because his trial attorney: (1) failed to investigate a third party lookalike defense in a timely manner; (2) failed to inform the petitioner adequately of the significance of forgoing use of the lookalike defense; and (3) presented to the petitioner a choice between use or forbearance of the defense. U.S. Const., amends. VI and XIV. The habeas court dismissed the petition, finding that the petitioner had failed to meet his burden of establishing that the representation by his attorney at trial was ineffective and had prejudiced the petitioner.

" 'A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense. . . . Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.' *Strickland* v. *Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh. denied, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984); *Aillon* v. *Meachum,* 211 Conn. 352, 357, 559 A.2d 206 (1989). . . .

"Establishing that counsel's performance was deficient 'requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' *Strickland* v. *Washington,* supra, 687. To demonstrate this 'the defendant must show that counsel's representation fell below an objective standard of reasonableness.' Id., 687–88. 'In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.' Id., 688. 'Judicial scrutiny of counsel's performance must be highly deferential,' and courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' Id., 689, quoting *Michel* v. *Louisiana,* 350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955), reh. denied, 350 U.S. 955, 76 S. Ct. 340, 100 L. Ed. 831 (1956); see also *Burger* v. *Kemp,* 483 U.S. 776, 788–96, 107 S. Ct. 3114, 97 L. Ed. 2d 639 [reh. denied, 483 U.S. 1056, 108 S. Ct. 32, 97 L. Ed. 2d 820] (1987); *Darden* v. *Wainwright,* 477 U.S. 168, 185–86, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986); *Aillon* v. *Meachum,* supra, 357; *Valeriano* v. *Bronson,* 209 Conn. 75, 86, 546 A.2d 1380 (1988); *Levine* v. *Manson,* 195 Conn. 636, 640, 490 A.2d 82 (1985)." *Fair* v. *Warden,* 211 Conn. 398, 402–404, 559 A.2d 1094, cert. denied, 493 U.S. 981, 110 S. Ct. 512, 108 L. Ed. 2d 514 (1989).

I

The petitioner first claims that his trial counsel's failure to investigate a third party lookalike defense in a timely manner constituted ineffective assistance of counsel. The petitioner does not challenge the adequacy

of the investigation; see *Levine* v. *Manson,* supra, 638; *Siemon* v. *Stoughton,* 184 Conn. 547, 554, 440 A.2d 210 (1981); *Chace* v. *Bronson,* 19 Conn. App. 674, 678, 564 A.2d 303 (1989); but only its timing. According to the petitioner, a reasonably competent defense attorney would have initiated an investigation into a third party lookalike defense earlier than did his trial counsel in this case. We do not agree.

During their initial consultation in late March or April, 1985, the petitioner and his attorney, Kenneth Rosenthal, a public defender in the New Haven office, decided to file a motion for a lineup before the victim. Rosenthal asked the petitioner if he knew of anyone who would be willing to participate in a lineup if the motion were granted. In response to this inquiry, the petitioner offered the names of two men presently in the lockup, who had agreed to participate in a lineup for the petitioner. The petitioner also mentioned that one of the men (the third party) had a mark on the left side of his face. Thereafter, Rosenthal filed a motion for a lineup which was later denied. Approximately six months later, during jury selection, after several avenues of defense had gone awry, Rosenthal became aware that the third party who had agreed to stand in a lineup not only had a mark on the left side of his face, but had some other physical similarities to the petitioner as well as robbery charges pending against him. Rosenthal thereupon instructed an investigator to obtain a mugshot of the third party which Rosenthal received the following day. After viewing the mugshot, Rosenthal subpoenaed copies of arrest warrant applications pertaining to the third party from the New Haven police department in order to prepare a lookalike theory of defense. Rosenthal intended to use the third party lookalike evidence to cross-examine the detective who had investigated the robbery in an attempt to show that the investigation was incomplete.

In addition, he intended to present the evidence as an affirmative defense of third party culpability.

Shortly thereafter, Rosenthal discovered that another attorney in the New Haven public defender's office, Robert Sweeney, was representing the third party on an unrelated robbery charge. Rosenthal and Sweeney discussed the matter and decided that because the petitioner was about to proceed to trial, Sweeney would file a motion to withdraw as counsel for the third party. Rosenthal then informed the petitioner that he was preparing a lookalike defense and that despite a conflict of interest problem, he intended to present the defense unless prohibited from doing so.

As the trial commenced, it appeared to Rosenthal that there would not be a ruling on Sweeney's motion before Rosenthal had to cross-examine the detective. After research and reflection, Rosenthal informed the petitioner that due to the unresolved conflict of interest, he could not present the third party lookalike defense as previously indicated and, further, that the petitioner could either proceed to trial with Rosenthal's representation but without the defense, or Rosenthal could move to withdraw as defense counsel and the petitioner would receive a new attorney and probably a new trial.

The petitioner asserts that had Rosenthal commenced an investigation into the third party lookalike defense earlier, he would not have been placed in the untenable position of making a quick decision as to how to proceed and, therefore, Rosenthal would not have offered the petitioner a choice which he now contends was erroneous. "The petitioner's ruminations on what might have happened if his attorney had conducted [an earlier] investigation are largely speculative." *Chace* v. *Bronson,* supra, 679. Moreover, "[t]he reasonableness of an investigation must be evaluated not through

hindsight but from the perspective of the attorney when he was conducting it." *State* v. *Talton,* 197 Conn. 280, 297–98, 497 A.2d 35 (1985); see also *Levine* v. *Manson,* supra, 649; *Chace* v. *Bronson,* supra, 678.

The reasonableness of an attorney's investigative decisions often depends critically on the information supplied by his client. *Strickland* v. *Washington,* supra, 691; *United States* v. *Decoster,* 624 F.2d 196, 209–10 (D.C. Cir. 1976), cert. denied, 444 U.S. 944, 100 S. Ct. 302, 62 L. Ed. 2d 311 (1979). Although the petitioner asserts that during their first meeting, he told Rosenthal that the third party bore a closer resemblance to the victim's description of the perpetrator than did the petitioner, Rosenthal testified twice that the petitioner merely mentioned the third party in the limited context of the need for persons to participate in a lineup. Despite Rosenthal's inability to recall exactly how he later became apprised of the similarities between the petitioner and the third party that prompted his investigation, the habeas court could reasonably have concluded that Rosenthal did not become aware of the potential for a viable third party lookalike defense until virtually the eve of trial.

At the habeas hearing, the petitioner presented expert testimony from Jonathan Silbert, a criminal defense attorney, and Professor Geoffrey Hazard, Jr. Silbert testified that a criminal defense attorney's failure to conduct a prompt investigation into a third party lookalike falls below the standard of reasonable competence. Hazard testified that, in his opinion, Rosenthal committed severe neglect in failing to investigate the third party lookalike prior to trial. The opinions of both experts were expressly predicated, however, on the assumption that Rosenthal had been told, approximately six months before the onset of trial, that the third party bore a closer resemblance to the alleged per-

petrator than did the petitioner. As noted above, this assumption is not supported by the record. We conclude, therefore, that the petitioner has failed to sustain his burden of establishing that under the circumstances, Rosenthal's timing with respect to the investigation into the third party lookalike defense fell below an objective standard of reasonableness.

## II

The petitioner's second claim is that his trial counsel's failure to inform him adequately of the significance of forgoing use of the third party lookalike defense constituted ineffective assistance of counsel. This claim is without merit.

When the petitioner's trial began, Rosenthal asked Donald Dakers, the chief public defender in the New Haven office, to request immediate action on the motion to withdraw filed by Sweeney, because he was planning to use the lookalike evidence to cross-examine the detective who had investigated the incident. Thereafter, Dakers informed Rosenthal that the court had indicated its reluctance to rule on the motion in the absence of the prosecutor appearing in the case and, further, that even if Sweeney's motion to withdraw were granted, there was some feeling on the part of court personnel that there might be an ethical problem in Rosenthal using the third party lookalike evidence. Concerned by this information, Rosenthal consulted several criminal defense attorneys. One of the attorneys, Jacob Zeldes, advised Rosenthal to refrain from using the third party lookalike evidence and implied that Rosenthal should withdraw from representation of the petitioner. Zeldes also pointed out that there was a case then pending in Fairfield County in which a former potential client was suing an attorney for implicating him in an offense in the course of

defending an actual client. Next, Rosenthal met with the trial judge and the prosecutor in chambers and informed them that he had what he perceived as an ethical problem in using certain evidence. It was at this point that Rosenthal told the petitioner that in light of new information, he felt ethically precluded from using the third party lookalike defense that he had earlier stated he would vigorously pursue. Rosenthal thereupon offered the petitioner the alternatives previously mentioned: (1) to proceed with Rosenthal as counsel and refrain from using the third party lookalike defense; or (2) to obtain new counsel and present the defense.

Shortly thereafter, Rosenthal informed the court that because of a potential conflict of interest, the rules of ethics prevented him from presenting certain evidence on the petitioner's behalf, and that, after advising the petitioner of two options, the petitioner had "preliminarily" chosen to proceed with trial and forgo use of the pertinent evidence. Moreover, although absence of the evidence would leave a "hole" in the petitioner's case, Rosenthal and the petitioner believed that the case was going well and the petitioner was concerned about concluding the matter. Rosenthal then requested a moment to confer with the petitioner because he was "torn" as to how to proceed. The court granted this request.[3]

---

[3] "The Court: Mr. Rosenthal, you indicated you wanted to put something on the record?

"Mr. Rosenthal: Yes, Your Honor. At the conclusion of yesterday's proceedings, I had subpoenaed some records from the New Haven Police Department pertaining to an individual, some records that I wished to use to cross-examine, potentially, Detective [Mary] Fish. I should indicate to the Court these records relate in a general way to a potential look-alike in this case. It would have been our claim that that was so; that there was information that came to my attention in a way that was focused last Thursday afternoon, late in the afternoon after court, that our office has a conflict in that the subject of the look-alike is someone that another member

Upon return, Rosenthal informed the court that the petitioner wished to proceed with the trial. The trial court thereupon canvassed the petitioner in order to determine whether Rosenthal had fully explained his

of my office represents in this courthouse presently, not on the—Well, I'll leave it at that—And that we would move to withdraw from that other case thinking that that would solve the problem.

"In discussions today, Your Honor, and some research as well, I have come to the conclusion that the rules of ethics prohibit me—even if the motion to withdraw in the other case is granted—prohibit me from pursuing this line of defense. And I should indicate to the Court, as I have indicated to my client—I don't mean to waive any other aspects of my communications with my client in this regard—that I feel as a defense attorney in this case, that this piece of evidence is very powerful evidence, would be very powerful evidence either in cross-examination, but perhaps more importantly as a part of the defense. And I cannot—I don't think the rules of ethics would permit me to go into the details as to why that is so. I think there's information on the public record that would bear out what I'm saying. And I have explained that to my client in discussions with him concerning where we stand in the case and particularly where we stand in the case as it bears on what I perceive to be my inability as his lawyer to pursue this item of a powerful defense.

"I indicated to him there are really two alternatives I could see at this point. One is that I withdraw from the case. I suppose in that case there would have to be a mistrial declared and a delay in the proceedings. That is something that does not sit well with my client. And the records will reflect there's been motions for a speedy trial in the case almost from the day it came into the courthouse. I never had a client that's been persistent about getting his trial and getting the case resolved immediately, persistent as he.

"Or number two, my staying in the case, the trial going forward; and in a sense I would have to tie one hand behind my back. I could not address this issue in any manner, shape or form because I am prohibited from doing so from the rules of ethics that would prohibit me of casting aspersions, not really just aspersions, but really implicating in criminal activity a present client of the firm.

"We filed a motion to withdraw immediately last Friday when this information became focused on. Mr. Williams has indicated to me, but I am urging him—I have urged him, and I continue to urge him to think about it as long as he needs to. This is something that I really discussed with him just in the last couple of hours. He may have a decision—He indicated preliminarily he made a decision he would like to continue with the trial, understanding that in doing so he is giving up—Well, I can't bring this information before the jury.

"The Court: Well, Mr. Rosenthal, are you representing that that's the position your client is taking?

inability to present the lookalike defense and whether the petitioner understood the consequences of his decision. In the colloquy between the court and the petitioner that followed, the petitioner indicated that he understood fully the consequences of refraining from pursuit of the lookalike defense by continuing to have Rosenthal represent him.[4]

---

"Mr. Rosenthal: I was just talking with him again, Your Honor, in the room after we came out of chambers, to reiterate to him—I should say, Your Honor, that this is something that is turning around in my mind. It's something that I had a discussion with an attorney in Bridgeport about less than an hour—approximately an hour ago; and it was that, in particular, that made me realize something that I hadn't realized before; that whatever the other case may mean, I have a problem in this case. It's something, the more I think about it, the more I am concerned about it. Both because I think about losing—how much of a hole it leaves in the case. At the same time I realize—I feel the case has been going well and that Mr. Williams, I know, is concerned about concluding the case. So I am torn, and I don't know that he is at this point. But I'm urging him in a way, and I have urged him in private as well, to think long and hard about giving up this information.

"The Court: Well, and what is the—

"Mr. Rosenthal: Can I confer with him briefly, Your Honor?

"The Court: Go ahead.

"Mr. Rosenthal: Can I just have a minute to talk with him in the other room?

"The Court: Go ahead."

[4] "The Court: Mr. Rosenthal, you were conferring in the other room with your client for ten minutes or so.

"Mr. Rosenthal: He has indicated, Your Honor, that he wishes to proceed with the trial. . . .

"The Court: I want to make sure the record is clear that Mr. Williams wishes to proceed as you've indicated.

"I gather, Mr. Rosenthal, you have spent some time before we opened court here, explaining the situation and the problems you were confronted with, with your client. And you've just done it again for ten minutes or so in the side room while we waited here.

"Is that correct, Mr. Williams? Has Mr. Rosenthal explained what his—what the problem he has with presenting what we call, for the sake of a better word, a look-alike defense? Has he explained it to you?

"[The Petitioner]: Yes, he explained it, Your Honor.

"The Court: And you understand that if he—that he feels that if he continued to represent you in this case, that he ethically can't bring up that

During the colloquy, the petitioner inquired about the amount of time that would elapse if he were to obtain a new attorney and a new trial. In response to this inquiry, Rosenthal requested additional time to speak with his client because "[he] is still pondering this decision and may need some legal advice . . . ." Following a brief conference, Rosenthal once again informed the court that the petitioner wanted to proceed with the trial. The trial proceeded without reference to the lookalike evidence.

In *State* v. *Williams,* supra, we rejected the petitioner's assertion that he " 'was apprised of neither the factual context of what he was relinquishing, the legal options available, the tactical implications of his action, nor the substantial risks and pitfalls he was facing' "; id., 166; concluding that the petitioner had "evinced a knowing and intelligent waiver of the right to conflict-free representation." Id., 172. The petitioner now renews his assertion that he was uninformed as the basis for an ineffective assistance of counsel claim. Although the right now asserted is different from that raised in his appeal from his burglary and robbery convictions, it does not alter our earlier rejection of his factual contention. As previously stated, absent any showing to the contrary by the petitioner, the trial

---

claim in any respect, can't offer evidence on it, or he can't make it in any way? It's something that the jury will never hear about.

"Do you understand that?

"[The Petitioner]: Yes, I understand.

"The Court: And despite that, your position is you wish him to continue with this trial and not make that claim, is that what you want done?

"[The Petitioner]: Yes.

"The Court: Are you sure you understand this now?

"[The Petitioner]: Yes.

"The Court: Mr. Rosenthal, you are satisfied, based on talking with your client, that he does understand the nature of the problem and exactly what he's doing here?

"Mr. Rosenthal: Yes, Your Honor, I am.

"The Court: Well, then we should go ahead."

court was entitled to rely upon Rosenthal's represen-tation that he had adequately explained the nature of the conflict to the petitioner, and upon the statements of the petitioner that he understood the consequences of forgoing use of the lookalike evidence. Id., 170. We therefore reject this claim.

### III

The petitioner's final claim is that because the choice between use or forbearance of the lookalike defense that his trial counsel presented to him was based on a misunderstanding of the law, trial counsel rendered ineffective assistance of counsel. According to the peti-tioner, despite the fact that the third party was cur-rently being represented by the public defender's office, it was entirely permissible under the ethical rules governing attorney conduct for Rosenthal to use the third party lookalike evidence in the petitioner's defense.[5] We do not agree.

At the habeas hearing, both Silbert and Professor Hazard testified that Rosenthal was plainly mistaken as to his legal responsibilities with respect to the third party and, therefore, offered an improper choice of alternatives to the petitioner. The proper course of action, in their opinion, would have been for Sweeney to withdraw from representation of the third party and for Rosenthal to continue representing the petitioner and pursue the lookalike defense. The experts empha-sized that because Rosenthal had obtained the evidence involving the third party, the mugshot and the arrest

---

[5] The petitioner does not challenge that because Rosenthal and Sweeney were attorneys in the same public defender's office, each of them was bound by the duties that the other owed to his clients. See Code of Professional Responsibility DR 5-105 (D); Rules of Professional Conduct 1.10. The Rules of Professional Conduct superseded the Code of Professional Responsibil-ity, effective October 1, 1986.

warrant applications, from the New Haven police department rather than from the public defender's office, it was not a confidence or secret and thus Rosenthal would not breach the duty of confidentiality owed to the third party by revealing it. See Code of Professional Responsibility DR 4-101; Rules of Professional Conduct 1.9 (b).

Rosenthal was concerned, however, about his duty of loyalty to the third party, specifically about implicating a client in a crime. Although Professor Hazard mentioned the duty of loyalty and its derivative prohibition against representing adverse interests, both experts were under the assumption that the withdrawal of Sweeney could have been secured and, therefore, did not address its implications in this case.[6]

"A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except . . . ; Code of Professional Responsibility DR 5-105 (B); if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf

---

[6] Because the experts were presented with a factual scenario in which Rosenthal was told that a third party bore a closer resemblance to the victim's description of the perpetrator than did the petitioner, they assumed for purposes of this third claim that if Rosenthal had investigated the third party earlier, Sweeney could have moved to withdraw earlier and the motion would have been granted prior to Rosenthal's cross-examination of the detective. Thus, the only obstacle to Rosenthal's presentation of the third party lookalike evidence would have been the duty of confidentiality owed to a former client. In light of our conclusion that Rosenthal was unaware of this potential defense until the eve of trial, we will not assume that Sweeney's motion to withdraw could have been filed any earlier than it was in this case.

of each." Code of Professional Responsibility DR 5-105 (C); Rules of Professional Conduct 1.7 (a) and (b); see also *Acheson* v. *White,* 195 Conn. 211, 214–15 n.5, 487 A.2d 197 (1985); *Tomczuk* v. *American Mutual Ins. Co.,* 9 Conn. App. 194, 197, 517 A.2d 1053 (1986). If Rosenthal had proceeded to cross-examine the detective with the third party lookalike evidence, the simultaneous representation of the petitioner and the third party by the public defender's office would, undoubtedly, have involved the representation of "differing interests" and may well have adversely affected the independence of the attorneys' professional judgment. Initially, Rosenthal sought to avoid such problems by terminating the simultaneous representation through the immediate withdrawal of Sweeney from representation of the third party. This effort, however, proved unavailing, so Rosenthal sought out the advice of other criminal defense attorneys. On the basis of this advice, Rosenthal recognized that he could ameliorate the potential conflict by either (1) terminating the simultaneous representation by withdrawing from representation of the petitioner, or (2) ensuring "that he [could] adequately represent the interest of each" which in Rosenthal's judgment required an informed decision by the petitioner to forgo use of the lookalike defense. Code of Professional Responsibility DR 5-105 (C).

"[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland* v. *Washington,* supra, 690. In this case, Rosenthal was presented with what he reasonably perceived as a duty of loyalty problem. The situation arose in the midst of trial after the petitioner had made numerous requests to move the proceedings along. After attempts to secure Sweeney's immediate withdrawal had been

unsuccessful, Rosenthal, relying on the advice of other competent attorneys, informed the petitioner of the problem, alternative solutions to the problem and the relevant considerations necessary for the petitioner to make an informed decision as to which route to take. See generally *Bent* v. *Green,* 39 Conn. Sup. 416, 422, 466 A.2d 322 (1983) (attorney has duty to keep client informed); see also Code of Professional Responsibility EC 9-2; Rules of Professional Conduct 1.4. "Under these circumstances, we conclude that counsel's conduct fell 'within the wide range of reasonable professional assistance.' *Levine* v. *Manson,* supra [640]." *Chace* v. *Bronson,* supra, 680.[7]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[7] In light of our disposition of this claim, it is unnecessary for us to address to what extent, if any, the duty of confidentiality was implicated.