[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The petitioner, Bernard Bewry, raises the following claims in his Third Amended Petition: that he was denied the effective assistance of counsel at the trial and sentencing levels because his trial attorneys failed to 1) conduct a proper pre-trial investigation that would support impeachment of a witness's testimony; 2) move to suppress the petitioner's confession on the grounds that the confession was obtained involuntarily; 3) locate and have the petitioner's clothes checked for presence or absence of gunpowder residue; and 4) proffer expert testimony regarding the ability of a rusty weapon to fire ammunition. These alleged failures deprived the petitioner of his federal and state rights to the effective assistance of counsel in violation of the Sixth andFourteenth
Amendments to the United States Constitution as well as Article I, Section 8 of the Connecticut Constitution.
After a trial on the merits during which the petitioner was the sole witness, the Court concludes that the claims of ineffective assistance of counsel are without substance. The Court, therefore, denies the petition for a writ of habeas corpus.
 INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD
"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of the conviction has two components. First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that the deficient performance prejudiced the defense. Unless a petitioner makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable, Stricklandv. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674, reh. denied, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984); Aillon v.Meachum, 211 Conn. 352, 357, 559 A.2d 206 (1989); Fair v. Warden,211 Conn. 398, 402, 559 A.2d 1094, cert. denied, 493 U.S. 981,110 S.Ct. 512, 107 L.Ed.2d 514 (1989)." Henry v. Commissioner of Correction,60 Conn. App. 313, 316-7, ___ A.2d ___ (2000).
"The first component, generally referred to as the performance prong, requires that the petitioner show that counsel's representation fell below an objective standard of reasonableness. In Strickland, the United States Supreme Court held that judicial scrutiny of counsel's performance must be highly deferential. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that CT Page 13498 counsel's conduct falls within the wide range of reasonable professional assistance; that is, the petitioner must overcome the presumption that, under the circumstances, the challenged action might be considered sound trio strategy. Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable and professional judgment.
"Even if a petitioner shows that counsel's performance was deficient, the second prong, or prejudice prong, requires that the petitioner show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal citations and quotations omitted.) Id., 317-8. Also see Commissioner of Correction v. Rodriguez,222 Conn. 469, 477, 610 A.2d 631 (1992).
"A reviewing court can find against the petitioner on whichever [Strickland prong] is easier. Valeriano v. Bronson, 209 Conn. 75, 85-6,546 A.2d 1380 (1988); Nardini v. Manson, 207 Conn. 118, 124, 540 A.2d 69
(1988); Magnotti v. Meachum, 22 Conn. App. 669, 674, 579 A.2d 553
(1990); Beasley v. Commissioner of Correction, [supra, 47 Conn. App. 264]."Petaway v. Commissioner of Correction, 49 Conn. App. 75, 76 n. 2,712 A.2d 992 (1998). "A court deciding an ineffective assistance of counsel claim need not address the question of counsel's performance, if it is easier to dispose of the claim on the ground of insufficient prejudice." Nardini v. Manson, supra, 207 Conn. 124.
 I
The petitioner's habeas corpus claims arise out of two criminal jury trials. In State of Connecticut v. Bernard Bewry, docket numbers 54830 and 54831 (hereinafter "Trial 1"), the petitioner entered not guilty pleas and elected a jury trial. The charges pleaded to were, respectively, as follows: in docket number 54830, criminal attempt to commit murder in violation of C.G.S. §§ 53a-49 (a)(2) 53a-54a(a), robbery in the first degree in violation of C.G.S. § 53a-134 (a)(2), two counts of assault in the second degree in violation of C.G.S. §53a-60 (a)(2), and carrying a pistol without a permit in violation of C.G.S. § 29-35 (a); and in 54831, a single count of murder in violation of C.G.S. § 53a-51a. The two docket numbers were consolidated for trial.
The petitioner was also the defendant in State of Connecticut v.Anthony Peart a.k.a. Bernard Bewry, docket number 54832 (hereinafter "Trial 2"), in which he entered pleas of not guilty with a jury election to attempted assault in the first degree in violation of C.G.S. § CT Page 13499 § 53a-49 (a)(2) 53a-59 (a)(1), attempted assault on a peace officer in violation of C.G.S. §§ 53a-49 (a)(2) 53a-167c (a)(1), carrying a pistol or revolver without a permit in violation of C.G.S. § 29-35, and interfering with an officer in violation of C.G.S. 53a-167a (a).
Trial 1 resulted in a jury verdict on September 22, 1989 of not guilty of murder, guilty of the lesser included offense of intentional manslaughter in the first degree in violation of C.G.S. § 53a-55
(a)(1) in docket number 54831; not guilty of robbery in the first degree; guilty of criminal attempt to commit murder; guilty of two counts of assault in the second degree; and guilty of carrying a pistol without a permit in docket number 54830. On March 2, 1990, Trial 2 also resulted in guilty verdicts by the jury for the attempted assault in the first degree, attempted assault on a peace officer, carrying a pistol or revolver without a permit and interfering with an officer counts in docket number 54832.
The Trial 1 convictions resulted in the following sentences, imposed November 30, 1989 (Quinn, J.): in docket number 54831 (intentional manslaughter), 20 years; in docket number 54830 (criminal attempt to commit murder), 20 years, to run consecutive to the 20 years imposed in docket number 54831; and 5 years each on 2 counts of assault in the second degree and carrying a pistol without a permit, to run concurrent with each other and concurrent with the sentence imposed in docket number 54831. The total effective sentence imposed as a result of Trial 1 was 40 years. The petitioner appealed the Trial 1 convictions, which were affirmed in State v. Bewry, 26 Conn. App. 242, 600 A.2d 787 (1991), cert. denied, 221 Conn. 911, 602 A.2d 11 (1992).
On March 15, 1990, the petitioner was sentenced (Miano, J.) for the Trial 2 convictions: 20 years for attempted assault in the first degree; 10 years for attempted assault on a peace officer, to run concurrent with the 20 years for the attempted assault in the first degree count; 5 years for carrying a pistol without a permit, concurrent with the 20 years; and 1 year for interfering with an officer, also concurrent with the 20 years. The total effective sentence arising out of the Trial 2 convictions was 20 years, to be served consecutive to the sentences imposed in Trial 1. These convictions were also appealed and upheld in the per curiam decision State v. Bewry, 24 Conn. App. 823, 588 A.2d 1090
(1991).
The petitioner was represented by public defenders Susan Brown and Kenneth Simon in both Trials 1 and 2. The first and second ineffective assistance of counsel claims raised by the petitioner in count one of the habeas petition arise out of Trial 1; the third and fourth claims, enunciated in count two of the petition, however, arise out of Trial 2. CT Page 13500 All four claims are against both attorneys.
 II
The petitioner alleges in his first claim that his trial attorneys failed to conduct a proper pre-trial investigation that would support impeachment of a witness's testimony. Specifically, it is alleged that counsels' failure to investigate Officer Nicholas Russo's illegal drug use, arrest and prosecution for that use resulted in the inability to impeach Officer Russo's testimony at the petitioner's trial. Third Amended Petition, at 3. A review of the record in this case manifestly supports the conclusion that this claim has no merit.
"During the defendant's trial, Detective Nicholas Russo testified that his address was 50 Jennings Road in Hartford, the location of the Hartford police department. Russo testified that he took a voluntary statement from the defendant in connection with the Charlotte Street incident. The defendant signed this statement. Russo also testified that the defendant was calm and cooperative during the interview and that he did not notice anything unusual about the defendant's emotional state that might have interfered with his ability to give an accurate statement. When the defendant took the stand, he testified that the statement was not accurate in certain very minor respects. He also testified that he was in pain at the time he gave the statement, having just been released from the hospital after suffering a gunshot wound.
"In a pretrial motion, the defendant had made the standard motion that the state provide him with `any record of felony convictions of the witnesses' whom the state intended to call at trial and `any record of felony or misdemeanor charges pending against the witnesses.' No such information as to Russo was disclosed by the state.
"The defendant later discovered that, in fact, at the time of his trial, Russo was under suspension from the Hartford police department due to the pendency of criminal action against him . . . and that he was on accelerated rehabilitation for that charge at the time that he testified against the defendant. In his motion for a new trial, the defendant further alleged that `[u]pon information and belief said detective had a drug problem which may well have affected his perceptions on the evening he interrogated the defendant.'" State v. Bewry, supra,26 Conn. App. 247-8.
The petitioner's trial counsel argued at the hearing on the motion for a new trial that "this non-disclosure was very harmful to our case. It ended up being a test of credibility between Mr. Bewry . . . and Officer Russo in that Officer Russo took the defendant's statement and that was CT Page 13501 what he was testifying to in court and his credibility should have [been] put into question and could have been because of his active criminal case, especially dealing with a drug case." Respondent's Exhibit 1 (Dec. 14, 1990 Tr.), at 3. It was also argued that "the defense is entitled to plan its strategy[.] . . . We did file a Motion to Suppress the statement of Mr. Bewry. We did not pursue the Motion once we filed it because we didn't feel that we had any basis for it at that time. If we had known about Officer Russo's condition, we certainly would have been able to make a different strategy and we would have made a different strategy and pursued the Motion to Suppress." Id., at 4.
According to the State, however, "[t]he only reason that Detective Russo was called as a State's witness was to identify the defendant's statement; to indicate that he gave him his rights; and generally, the circumstances surrounding the giving of the statement." Id., at 7. This Court has reviewed the direct and cross examinations of Officer Russo; Petitioner's Exhibit E (Trial 1 Tr.), at 111-130; and concludes that the State's description of the reason for and substance of Officer Russo's testimony is accurate. Officer Russo testified that he was not involved in the investigation of the petitioner's case at any time prior to the taking of the statement, that he was asked by another officer to assist in conducting an interview of the petitioner, and that after the request to assist, he reviewed the case with other detectives and commenced the interrogation. Id., at 121.
In deciding the motion for a new trial, the court (Quinn, J) held that the "question becomes one of whether or not this information and/or any change in trial tactics would have changed the outcome of this case. . . . [T]he petitioner must demonstrate by a preponderance of the evidence that newly discovered evidence or claims is likely to produce a different result in a new trial." Respondent's Exhibit 3 (March 25, 1991 Memorandum of Decision), at 2-3.
The standard applied by the trial court is no different than the second, or prejudice, prong from Strickland. That is, the petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Commissioner of Correction v.Rodriguez, supra, 222 Conn. 477.
At the habeas corpus trial, the petitioner testified that during the pendency of Trial 1 he became-aware of Officer Russo's arrest through a newspaper article. The newspaper article itself, however, was not entered as evidence in this habeas case. It is not clear from the record at precisely which point the petitioner notified his attorneys of the CT Page 13502 article. It also is not clear exactly how much was known about Officer Russo's problems by the petitioner's attorneys prior to their cross-examination of Officer Russo. Respondent's Exhibit 2 (March 8, 1991 Tr.), at 5-7.
This Court, even if it were to find that any failure to investigate meets the Strickland performance prong, would still have to find that the petitioner also satisfies the prejudice prong. Strickland v. Washington, supra, 466 U.S. 679. And it is this second prong upon which the petitioner's claim falters, for this Court can find no evidence in the record that undermines the confidence in the outcome of the underlying trial. As the Appellate Court held: "since [Officer Russo's] credibility was not seriously put into dispute by the defendant's testimony and since his testimony could have been corroborated by [Officer] Craddock, there is no likelihood that any false impression given by [Officer Russo's] testimony would have influenced the jury in reaching its verdict." Statev. Bewry, supra, 26 Conn. App. 250.
Consequently, this Court finds that the petitioner has failed to show that the result of the trial would have been any different had Officer Russo's illegal drug use, arrest and prosecution for that use been discovered earlier and used during cross-examination to discredit Officer Russo's testimony. The petitioner has in no way undermined the confidence of the outcome of the trial. The ineffective assistance of counsel claim based on failure to investigate and impeach is without merit.
 III
The second claim, also arising out of Trial 1, alleges that trial counsel failed to move to suppress the petitioner's confession on the grounds that "the confession was obtained involuntarily due to the petitioner's physical and mental condition at the time and impaired by post-operative prescribed medication and in violation of his right to counsel." Third Amended Petition, at 3-4. The petitioner also argues that he "was denied medication for the gunshot wound. He was shaking from the cold. In fact, he felt so badly that he laid down upon the floor in the interrogation room." Petitioner's Post-trial Brief, at 3.
"In order to be voluntary a confession must be the product of an essentially free and unconstrained choice by the maker. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of the confession offends due process. The determination of whether a confession is voluntary must be based on a consideration of the totality of circumstances surrounding it, including both the characteristics of the accused and the details of the interrogation. Factors that may be taken into account, upon a proper CT Page 13503 factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. Under the federal constitution coercive police activity is a necessary predicate to the finding that a confession is not voluntary." (Internal citations and quotations omitted.) State v. Correa, 241 Conn. 322, 328, 696 A.2d 944 (1997).
"The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect. In order to prevail, the defendant must show both that counsel's representation fell below an objective standard of reasonableness, and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Where defense counsel's failure to litigate aFourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." (Emphasis added.) (Internal citations and quotations omitted.) Kimmelman v. Morrison, 477 U.S. 365, 375,106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Also see Laaman v. United States,973 F.2d 107, 113 (2d Cir. 1992).
In support of this claim, the petitioner testified that he was dressed only in hospital garments during the interview, that the garments were wet from the rain and that he was very cold because the interview room was air conditioned. The petitioner additionally testified that he asked Officers Omiecinski and Russo for an attorney, but that this request was refused by the police's response that it was Saturday and that an attorney was not obtainable on a Saturday. Lastly, this Court heard testimony from the petitioner that the police informed him that the sooner the petitioner gave his statement, the sooner he would be made comfortable.
The following additional facts are necessary in addressing this claim. The petitioner was shot by a police officer on September 6, 1988, after which the petitioner was taken to Mount Sinai Hospital for treatment. Petitioner's Exhibit F3, at 662. He was discharged on September 17, 1988 and taken to the Hartford Police Department by officers. Officer Omiecinski testified that the petitioner appeared to be in normal health and "could be interrogated without too much difficulty." Id., at 906. In fact, the petitioner was "most cooperative;" Id.; and never expressed an unwillingness to answer the police's questions. Id., at 908. CT Page 13504
The petitioner's willingness to cooperate is also evidenced by both of the statements given to police investigators on Saturday, September 17, 1988. The events at issue in Trial 2 were the subject of the first interview and statement. That interview began at 11:03 A.M. and concluded at approximately 1:00 P.M. Respondent's Exhibit 5, at 1. Prior to being either interviewed or asked questions, the petitioner acknowledged that he fully understood his rights by initialing all five areas places where such assent may be given, including the right to an attorney and the right to refuse to answer any questions and/or stop answering questions at any time. Id. The petitioner then signed — at 11:07 A.M. — the signature block directly below the following waiver: "Now that I have been advised of my rights and that I fully understand these rights, I am willing to be interviewed and answer questions. I do not wish the presence of an attorney at this time. I am waiving these rights freely and voluntarily, without any fear, threat, c promise being made to me." Additionally, the acknowledgement of rights/waiver form is signed by two witnesses. Id. Each of the four statement pages is signed by the petitioner, two witnesses, and is notarized by a notary public. Id., at 2-5.
The second interview dealt with the events surrounding Trial 1. That interview began about three hours after the conclusion of the first interview, lasting from approximately 4:00 P.M. until 8:30 P.M. Respondent's Exhibit 6, at 1.[1] At the onset of the voluntary statement, the petitioner stated the following: "I have been read my rights, my constitutional rights three times today once this morning by a detective (Det. Omiecinski), and twice by you (Detective Russo) this afternoon. I do understand that I don't have to talk to the police without a lawyer present, but I do not wish to have a lawyer at this time while I tell the detectives about what happened[.] . . . I know that I have been here since 11:00 A.M., this morning (09-17-88) but I am not tired right now. I have been fed cookies and milk by Detective Russo, who also bought me a pack of cigarettes (Newport Lights) and I would rather sit in the police station as long as I can, rather than in a jail cell as it is more comfortable here. Further, I want to tell my side of the story in all these incidents to the police so that the prosecutor knows what I have to say, and also the judge will hear this." Id., at 1-2.[2]
The voluntary statement indicates that the interview was stopped at 6:50 P.M. so that the petitioner could eat pizza and drink soda. Id., at 4. The interview resumed at 7:00 P.M. The voluntary statement indicates that the petitioner "still wants to continue telling his side of the story and is not tired," and bears the petitioner's signature next to this statement regarding the resumption of the interview. Id., at 4-5. As with the first interview, all statement pages are signed by the petitioner and two witnesses, and each page is notarized. Id., at 1-8. It CT Page 13505 also bears noting that the second interview did not involve any of the witnesses from the preceding interview; the notary public also was different.
It is particularly noteworthy that a Motion to Suppress the statements given on September 17, 1988, was filed by the petitioner's trial counsel in Trial 2. The issue before the trial court was "whether or not the statements of September 17th were voluntary or involuntary." Petitioner's Exhibit F2, at 422. Petitioner's trial counsel unsuccessfully argued that the petitioner "was not competent to make such statements at the time they were made and any and all such statements were obtained by coercion, deceit, and overreaching by the Police and none of such statements were made voluntarily." Id., at 427.[3]
The trial court's decision on the motions to suppress includes the following:
 The defendant, Bernard Bewry, moves the Court to suppress oral and written statements made by him on September 17, 1988. The defendant claims violations of his Fourth, Fifth, Sixth and Fourteenth Amendment rights and also, under our Article I, Section 8 of the Connecticut Constitution. The defendant claims that at the time of the interrogation, he was suffering from the effects of his recent hospitalization, his removal from a heated hospital room to an airconditioned police interview room, clad only in hospital pajama, all of which caused him to be cold. He was in pain from his gunshot wound. Was sick, not walking straight, that he thought he was going to die, was hungry. That he felt that he had no choice but to talk and he was under the belief that if he talked to police about his pending charges, it would hasten his removal to the jail where he could lay down. . . . [T]he defendant further contends that all these factors caused any purported waiver of rights to be involuntary and that the extent and duration of the interrogation caused an effect of breaking down of the defendant's will, not to talk to the investigators. Petitioner's Exhibit F3, at 1058.
After making its factual findings, which included an analysis of theCorrea factors,[4] the trial court stated that
 Whether a purported waiver satisfies those requirements is a question of fact that depends on the CT Page 13506 circumstances of a particular case. The defendant's expressed written and oral waiver is strong proof that waiver is valid. The defendant responded appropriately to the questions addressed to him concerning his rights and also, to questions concerning the crimes propounded to him by police. The determination that the defendant validly waived his right to remain silent is buttressed by affirmative evidence of the defendant's knowing participation in his custodial interrogation. The records are devoid of any indication of threats or coercion or any overt psychological pressure applied by the police. Again, since there were no coercive police tactics employed, any Federal Constitutional claim of the defendant is foreclosed. Id., at 1063.
The trial court also found that Mr. Bewry "knew his rights; that there was a knowing, intelligent and voluntary waiver of those rights and that the statement was voluntary[;] . . . that the defendant, by his own account, never requested medical treatment, medical attention or to be returned to the hospital. Most importantly, the waiver was executed within minutes of the commencement of the interview and this Court feels dispels any claim of the breaking down of the defendant[; and that] the defendant made incriminating statements at the hospital to police personnel clearly indicating his desire to cooperate[.]" Id., 1064.
Given the more than apparent willingness of the petitioner to cooperate with investigators and the indication that the petitioner was provided for during the course of the interrogation, this Court has difficulty assigning any credibility to the petitioner's testimony at the habeas trial. Additionally, the petitioner has failed to present any evidence to this Court that, had a motion to suppress been filed in Trial 1, his statement would have been suppressed. Minnifield v. Commissioner ofCorrection, 62 Conn. App. 68, ___ A.2d ___, cert. denied, 256 Conn. 907, ___ A.2d ___ (2001). Consequently, this Court concludes that petitioner's second claim is entirely without merit.
 IV
The petitioner's third claim arises out of Trial 2 and alleges that trial counsel failed to locate and have the petitioner's clothes checked for presence or absence of gunpowder residue. There was little evidence submitted at the habeas corpus trial in support of this claim. The petitioner did testify that he was in the car with other individuals, that he had a gun but didn't fire it, and that he had on a long-sleeve shirt at the time the alleged shooting occurred. The petitioner also testified CT Page 13507 that this shirt and other clothing items were kept by the police, that he talked to his attorneys about these clothes, and that none of these clothes were introduced as evidence during the underlying trial.
"In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Stricklandv. Washington, supra, 466 U.S. 691. Also see Williams v. Warden,217 Conn. 419, 426, 586 A.2d 582 (1991), and Johnson v. Commissioner ofCorrection, 36 Conn. App. 695, 705, 652 A.2d 1050, cert. denied,233 Conn. 912, 659 A.2d 183 (1995). The burden of proving that the shirt was and is available for testing rests solely upon the petitioner.Jeffrey v. Commissioner of Correction, 36 Conn. App. 216, 650 A.2d 602
(1994); Ostolaza v. Warden, 26 Conn. App. 758, 765, 603 A.2d 768, cert. denied, 222 Conn. 906, 608 A.2d 692 (1992). "The police do not have a constitutional duty to perform any particular tests. . . . [T]he state does not have a federal constitutional obligation to conduct tests at an earlier date only because, in hindsight, there was a mere possibility that such tests may have produced exculpatory material." Milner v.Commissioner of Correction, 63 Conn. App. 726, 736, ___ A.2d ___ (2001),citing State v. Conn., 234 Conn. 97, 118, 662 A.2d 68 (1995).
Trial counsel did not testify at the habeas corpus trial, so the record before this Court does not support any determination whether counsels' actions were based on informed strategic choices made by the defendant and on information supplied by the defendant. Nevertheless, this Court finds, without speculating as to the strategic choices made by counsel, that the defense pursued at trial by counsel was entirely consistent with the petitioner's statement to police investigators. Defense counsel reasonably pursued a vigorous defense that hinged on demonstrating to the jury that the petitioner could not fire the nine-millimeter semi-automatic because it was not operating properly.
In the absence of any indication that the shirt was kept as evidence and available for testing, this Court is unable to conclude that counsels' choices were unreasonable, for it is entirely unknown whether testing would have bolstered or contradicted the petitioner's defense. Furthermore, because of the potential that testing the shirt could have negated the petitioner's defense, the need for investigation may have been considerably diminished or eliminated altogether. Counsels' alleged failure to pursue those investigations may not later be challenged as unreasonable in the absence of concrete proof to substantiate the ineffectiveness claim. This Court concludes that the petitioner has failed to demonstrate that his trial attorneys' performance fell below an objective standard of reasonableness. CT Page 13508
 V
The petitioner's final ineffectiveness claim alleges that counsel failed to proffer expert testimony regarding the ability of a rusty weapon to fire ammunition. The petitioner did not present any evidence at the habeas corpus trial regarding the nine-millimeter semi-automatic, nor was there testimony from an expert in support of this claim. A review of the record leads this Court to the conclusion that the petitioner has failed to show both that his trial attorneys' representation fell below an objective standard of reasonableness and that his defense was prejudiced.
During Trial 2, Officer Omiecinski was asked on direct examination "of what significance, if any, was the fact that there was an empty shell casing in the chamber?" Petitioner's Exhibit F3, at 774. Officer Omiecinski responded that the significance was that "the gun had jammed upon putting pressure on the trigger mechanism." Id. The normal operation of a workable semi-automatic weapon entails "an explosion . . . within the chamber itself sending the bullet forward and the cartridge being ejected. The slide going back and usually to the right portion of your body on most automatics. . . . [The action of the slide normally] puts another live round into the chamber. Id. Officer Omiecinski also identified the nine-millimeter handgun as being "a very rare type of handgun[, namely] a French military pistol from the 1950s." Id., at 775.
Another witness at the underlying trial was Trooper Gibbs, a Firearms and Toolmark Examiner assigned to the Forensic Science Laboratory. Id., at 818. Trooper Gibbs testified on direct examination that the handgun operated correctly during his firing of test bullets on October 7, 1988.Id., at 834. A request to have a second test done because of the difficulty with the handgun was conducted by Trooper Gibbs on February 19, 1990. Id., at 837. The second test was done because it was indicated to Trooper Gibbs that the decocking mechanism was not functioning correctly. Trooper Gibbs suggested that the firearm be sent back to him for further testing. Id., at 838-9. After removing the grips off the hand area, Trooper Gibbs was able to determine that the decocking mechanism was, in fact, not operating properly because "the gun was very dirty. It was very greasy, oily. The oil had gummed up around the sliding parts of the mechanism and it was actually very sticky and causing the parts to stick so that they did not move and operate properly under the spring tension." Id., at 842. Trooper Gibbs concluded that the passage of time of over a year and a half, during which the handgun was in police storage, as well as unknown storage conditions might be possible explanations why the handgun was functioning sporadically. Id., at 845-6. CT Page 13509
Trooper Gibbs was specifically asked on direct examination "[i]f a round was fired in that weapon and the shell casing failed to eject, are there any conditions which could cause that malfunction existing in that gun?" as well as "are there a lot of variables in terms of what might cause that gun not to properly eject a shell casing?" Id., at 849. Trooper Gibbs confirmed that there were a number of such variables: that the type of ammunition and the cleanliness of the ammunition and/or weapon have a bearing on a weapon's ability to eject a shell. Id.
Though Trooper Gibbs was not specifically asked about rust and the ability of a rusty weapon to fire ammunition, this Court finds, after reviewing the testimony of both Officer Omiecinski and Trooper Gibbs, that counsel for the petitioner effectively questioned both of these witnesses regarding the normal operation and malfunctioning of the handgun in question.[5] Trooper Gibbs's testimony in particular addressed the operability of the handgun under conditions that, though not specifically addressing rust and the impact of rust, are comparable enough that this Court does not find any prejudice arising from the fact that defense counsel did not have expert testimony regarding rust and how rust would affect the operation of the handgun. The petitioner has not demonstrated that the confidence in the outcome is undermined in any way, nor has he shown that there is a reasonable probability that the result of the proceeding would have been different. The petitioner has failed to show both that counsels' performance was deficient and that he was prejudiced. Thus, the petitioner's final claim is also without merit.
 CONCLUSION
This Court has concluded that the petitioner has failed to show that he was prejudiced by counsels' failure to discover and use information that could have been used to discredit Officer Russo's testimony. The petitioner has also been unable to demonstrate that he was prejudiced by the fact that no motion to suppress his statements to police was filed in Trial 1. The third claim advanced by the petitioner falters because he has not shown that his counsels' failure to test the shirt was unreasonable. Lastly, the claim of ineffectiveness of counsel based on failure to proffer testimony regarding the ability of a rusty weapon to fire ammunition is without merit because it does not meet either the performance or prejudice prongs.
The petitioner has not demonstrated that his trial counsel provided ineffective assistance of counsel. This Court, therefore, denies the petition for a writ of habeas corpus.
HON. DAVID M. BARRY, JTR CT Page 13510